# EXHIBIT B-1

## DESIGN AND BUILD AGREEMENT

Contract No: _2V058-00 5_  Project No: _2V058_
CSI No: _4700_  Vendor No: _68084_

**Project: GAME CREEK ZIP LINE, VAIL SKI RESORT, VAIL, COLORADO**

THIS  DESIGN AND BUILD AGREEMENT (the "**Agreement**") is made on the 19TH day of September, 2012 (the "**Effective Date**") between **BONSAI DESIGN INC.,** a Colorado corporation ("**Seller**"), whose Federal Identification Number, is 42-1720574 and **THE VAIL CORPORATION,** a Colorado corporation ("**Buyer**").

### BACKGROUND

A.     Buyer is the owner and operator of the Vail Ski Resort in Vail, Eagle County, Colorado (the "**Premises**").

B.     Seller desires to design, engineer, and potentially sell, deliver and install and Buyer desires to purchase from Seller, the services and equipment described in this Agreement.

### AGREEMENT

The parties agree:

1.     CONTRACT DOCUMENTS.  The "**Contract Documents**" consist of this Agreement and the following documents:

| | |
|---|---|
| Zip Line System Plans [To be attached in accordance with Section 2(c)(i)]. | Exhibit A |
| Seller's proposal for Game Creek Zip Line Tour Layout (the "**Proposal**") | Exhibit B |
| Special Considerations | Exhibit C |
| Change Order Form | Exhibit D |
| Lien Waiver Form | Exhibit E |
| Milestone Dates | Exhibit F |
| Course Commissioning Document Example | Exhibit G |

1

All modifications to this Agreement or other Contract Documents executed by both parties following execution of this Agreement will automatically become a part of the Agreement. The intent of the Contract Documents is to include all items necessary for the proper completion of the work described in this Agreement. If there is a conflict between the terms of this Agreement and any of the other Contract Documents, the terms of this Agreement will control.

2.    SERVICES.

(a)    BOTH PARTIES' CONTINUED OBLIGATIONS ARE CONDITIONED UPON BUYER'S RECEIPT OF APPROVAL FROM THE U.S. DEPARTMENT OF AGRICULTURE, FOREST SERVICE (THE "**FOREST SERVICE**"), TO THE EXTENT SUCH APPROVAL IS REQUIRED.

(b)    PAYMENT TO SELLER FOR DESIGN AND ENGINEERING WORK PROVIDED TO BUYER IS NOT CONDITIONED ON FOREST SERVICE APPROVAL

(c)    Engineering and Design.

(i)    Subject to Section 2(a), Seller will design and engineer the zipline described in the Proposal and all related components, (the "**Zip Line System**"). Seller will diligently create and deliver a proposed design to Buyer. Seller will promptly address any Buyer concerns and will revise the plans as necessary. Once the parties have reached a mutual agreement on the design and plans for the Zipline System, such plans will be attached to this Agreement as Exhibit A (the "**Plans**").

(ii)    Buyer is entering into this Agreement in reliance on Seller's professional skill and judgment in designing, manufacturing and installing the Zip Line System. Seller agrees to perform the Services (A) in accordance with this Agreement, Exhibit B, and Buyer's requirements and procedures; (B) in a manner consistent with the standards set forth by The Association for Challenge Course Technology ("ACCT"); (C) in a timely manner; and (D) in compliance with applicable federal, state (including compliance with ASTM standards, if applicable, and local regulations, codes and ordinances.

(iii)    All drawings, specifications, data or other material either received, developed or in the possession of Seller regarding this Agreement shall remain property of Buyer. Upon mutual agreement to construct the project, Seller will provide Buyer with complete sets of all specifications, schedules, plans, drawings, and other documents, including updates thereof, as soon as the documents become available. Buyer's use of design documents is limited to installation under the terms of this Agreement. Under no circumstances shall Buyer use delivered design documents, in part or in whole, for other projects or use by a third party. Seller shall retain the right to use drawings and photographs and the work for which it is providing services for the purposes of marketing and self-promotion of its services, provided Seller obtains prior written approval from Buyer for such use. Notwithstanding the foregoing, Seller shall retain copyrights to the format, trademarks and methodology used for services rendered under this Agreement, while Buyer shall

2



retain copyrights of the content for progress reports, meeting minutes, field observation reports and other correspondence sent to Buyer related to Services described herein.

(iv)     Project documentation shall only be produced in as much as required for engineering verification and stamped approval.  Buyer understands and agrees that apart from this requirement, any and all drawings, specifications, logic diagrams, process controls and layouts shall be produced solely for the needs of the Seller's crew to successfully complete the installation.

(v)     Documents furnished by Seller are not represented to be suitable for reuse by Buyer or others on extensions of the applicable project or on any other project.  Any reuse without specific written authorization or adaptation by Seller will be at Buyer's sole risk and without liability or legal exposure to Seller.

(vi)     Upon completion of the Zip Line System Installation, Seller will deliver to Buyer all original reproducible drawings, specifications, data and other material developed pursuant to this Agreement.  Seller may retain one reproducible copy of the items for evidentiary purposes.  Seller will also deliver to Buyer these documents in electronic form.

(vii)     Seller will provide a draft Zip Line Operations and Maintenance Manual (the "**Operations Manual**") to Buyer before any construction begins and will allow Buyer a meaningful opportunity to evaluate, comment on and discuss any proposed changes to the Operations Manual.  Minor changes to the Operations Manual will be included in the System Price (as defined in Section 3 of this Agreement).  Notwithstanding the foregoing, Seller will separately invoice Buyer for any substantial changes to the Operations Manual.

(d)     <u>Delivery and Construction</u>.  If Buyer elects to have the Zip Line System constructed and installed and provides Seller with a written notice to proceed (which Buyer may do or not do in its sole discretion):

(i)     Seller will furnish and deliver to Buyer, FOB Buyer's place of business, the Zipline System as further described in the Plans, including course design, supply, fabrication, construction, installation, start-up, testing, selection and provision of safety gear, guide training, documentation, start-up supervision and consulting, biannual course inspections for three years, and operations consulting, as described more fully in Section 2 (g), as further described in the Contract Documents.

(ii)     Seller will erect and install the Zip Line System in compliance with the Plans.  Seller will begin construction promptly after receiving a written notice (the "**Notice to Proceed**") from Buyer.   The Zip Line System must be delivered, installed for completion and ready for inspection and/or license testing, as applicable, no later than **(TO BE DETERMINED, see Exhibit F).**

(iii)     All work to be performed by Seller under this Agreement will be referred to as the "**Work.**"  Seller shall provide all hardware, materials and labor for course installation, including cable and termination hardware, lumber, framing and decking, and specialty equipment such as ropes, braking devices, stepping systems, bumpers, and padding, and Seller shall pay all shipping and transportation costs for delivery of these materials to the Site. Buyer may inspect the Zip Line System and its installation at any time.  If any of the Work is deemed by Buyer

3



to be deficient, Buyer will notify Seller and Seller will promptly rectify the deficiency to conform to the Contract Documents at Seller's cost.

(iv) Upon final delivery of Zip Line System, Seller will deliver a finalized Operations and Maintenance Manual to Buyer. Buyer agrees to utilize and adhere to the limitations and recommendations set forth in the Operations Manual in all material respects. Buyer understands and acknowledges that the provided Operations Manual has not addressed every possible area of concern and/or risk exposure and will require daily assessment and adherence to industry safe practices and protocols to attain the best possible reduction in risk to users of the Zip Line System facilities. In the event of a conflict between the Operations Manual and this Agreement, this Agreement will control.

(e)   Milestone Dates. The parties agree to use their best efforts to meet the Milestone Dates set forth on Exhibit E. If Seller believes it will be unable to meet any of the Milestone Dates, then it must comply with the following procedure:

(i)   Delays Beyond Seller's Control. If a delay is caused by circumstances beyond the reasonable control of Seller, as described in Section 19(d), Seller will promptly notify Buyer of the delay and provide, within five working days, a cost proposal for measures to mitigate the delay. Buyer will either:

(A)   reject the proposal and equitably adjust the Milestone Dates to incorporate the delay; or

(B)   accept the proposal and issue a change order in the form attached as Exhibit C ("**Change Order**"), which authorizes Seller to implement the measures.

(ii)   Delays Within Seller's Control. If the anticipated or actual failure to meet any Milestone Dates is caused by circumstances within Seller's reasonable control, Seller must promptly notify Buyer of the measures Seller proposes to regain the lost time and update subsequent Milestone Dates until the Zip Line System installation is back on schedule. Seller's work under this Section will be at no additional cost to Buyer.

(f)   Project Safety Controls and Commissioning. Buyer hereby acknowledges that the operation of the constructed facilities involves inherent risk of physical injury to participants and staff. In order to mitigate foreseeable risk as much as possible, Buyer and Seller agree:

(i)   During Zip Line System installation and testing, Seller shall retain full control of course access.

(ii)   Prior to overall course commission and grand opening, limited Zip Line System access shall be granted in accordance with each section of Commissioning/Access documents (as referenced in Exhibit G), i.e., Primary Owners & Qualified Staff, vs. Familiarization Guests & Media, vs. Friends and Family orientations during training weeks, and etc.

4



(iii)     Upon delivery of final Course Commissioning documentation and the completed Zip Line System; Buyer agrees to utilize and adhere to the limitations and recommendations set forth in the Course Operations Manual in all material and operational respects, which shall be provided to Buyer by Seller. Buyer understands that deviations from the Operations Manual may be necessary to manage risk but should never be undertaken in ways which heighten risk, such as use of uncertified guides, or unsafe/unauthorized zipping or rappelling practices.

(g)     On-Going Consultation and Buyer Responsibilities.

(i)     Buyer's Duty to Supervise Course Use. Buyer hereby acknowledges that it has arranged for the construction of the Zip Line System in full knowledge that the use of the constructed facilities involves some risk of physical injury to participants and staff. Buyer agrees that adequate security measures shall be undertaken to prohibit unauthorized access to the Zip Line System facilities and that it will not permit anyone to use these facilities except under the supervision of properly qualified staff members.

(ii)     Buyer's Duty to Inspect and Repair.  Buyer acknowledges that the current ACCT accepted standards in the field of canopy tour, zip line and challenge course operations require that it conduct regular inspections of all course elements and that it take out of service any elements that fail inspection until they have been repaired. Buyer further acknowledges that the current accepted ACCT standards of operation also require that it arrange an inspection and maintenance visit by Seller at least once yearly.

(iii)     Buyer's Duty to Communicate Changes in Facilities and/or Operations. During the three (3) year On-Going Consultation period, Buyer shall provide a clear written description of any requested material or operational deviations, exclusions, revisions, or additions to facility specifications such as hardware, equipment, etc., or to the Operations Manual or in the Operation of the Zip Line System facilities. This communication shall be submitted in writing by certified mail arriving at Seller's headquarters no fewer than ten days prior to Buyer acting on such deviations.  Buyer shall notify Seller of any such material or operational changes during the three (3) year On-Going Consultation period. Without Seller's approval of such deviations or additions, Buyer assumes all liability for any incident or accident caused by such deviations, exclusions, revisions or additions to the Zip Line System.

(iv)     Buyer's Duty to Maintain Staff Qualifications. Buyer acknowledges that currently accepted ACCT standards of operation in the field of canopy tour, zip line and challenge course operations require that it obtain site-specific professional training for all staff who will supervise and operate programs on its course. Buyer further acknowledges that accepted ACCT standards of operation require that it arrange review training for its staff by Seller at least once yearly. Buyer understands and acknowledges that foregoing third party training or operating the



5

course not in accordance with the limitations as set forth in the Course Operation's Manual, individually or together, introduces significant and unnecessary liability, is extremely discouraged.

       (v)      On-Going Consultation. In order to ensure safe practices, consistent services, preferred pricing and guaranteed emergency response timeframe, Seller shall extend the current discounted pricing to Buyer for training, inspection and maintenance services (other than those described in this Agreement and which are covered by the fees described in this Agreement) for a period three (3) years from the date of mutual execution of this Agreement.  In the event that Buyer purchases additional products or services from Seller, Buyer and Seller may choose to enter into a separate Parts and Services Agreement to address such discounted training, inspection, maintenance and parts in which case such agreement will control.

3.      ZIPLINE SYSTEM PRICE AND PAYMENT.  Subject to Sections 2(a) and 19(w), Buyer will pay Seller USD ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (plus any required taxes) for layout of the Zipline System (the "**Design Price**"). Buyer and Seller will mutually agree (in writing) on the future costs of the finalized design, manufacture, delivery, installation and engineering of the Zipline System and other Zipline System-related materials and services as described in the Proposal and the Plans (the "**Build Price**" and, collectively with the Design Price, the "**System Price**").  Invoices shall be submitted to Buyer by Seller by the 25th of the month in which the Work is performed and shall be accompanied by documentation as may be required by Buyer, and such other documentation as may be required by the Project Lender, if any. Seller's payment shall be received by the 25th of the following month provided that all of Seller's complete invoice and insurance certificates on file with Buyer are current. Out-of-pocket Expenses reasonably anticipated to be incurred by Seller for the Design Work are included in Seller's compensation, and are to be reimbursed (without any additional mark-up thereon).  All reimbursable expenses for the design and construction phases shall be preapproved by Buyer.

4.      RISK OF LOSS.  Seller will bear the risk of loss of, damage to, or deterioration of, the Zipline System from the time the Zipline System leaves Seller's premises until the Zipline System's License Date (defined in Section 10).

5.      OWNERSHIP.  Ownership of the Zipline System will pass to Buyer upon payment in full.

6.      EXPENSES.

      (a)      Transportation.  Seller shall assume responsibility for paying the costs of long-distance travel by its staff to and from PROJECT site during installation.

      (b)      Buyer agrees to reimburse Seller for all food and lodging costs incurred during installation, training and operational oversight.  Said reimbursements shall not exceed the prevailing daily per-diem rates for the area.

      (c)      On-Site Lodging.  Seller shall obtain housing for Seller's staff.  Buyer will reimburse Seller in an amount that shall not exceed ▆▆▆▆▆.


6

      (d)    Food.  Buyer shall reimburse Seller for groceries purchased for Seller's staff to prepare meals during design, installation and training.

      (e)    All reimbursable expenses shall be preapproved by Buyer.

7.    <u>TAXES.</u>  Buyer agrees to pay any applicable sales, excise, use or other tax when due in connection with the purchase and installation of the Zip Line System. Buyer will not pay taxes on field labor and other services rendered by Seller if the services are not subject to sales tax under Colorado law. Seller's invoices to Buyer must describe the charges in detail adequate to allow Buyer to verify the appropriate taxable amounts.  Seller will pay all import duties, customs charges or other taxes associated with foreign manufacture.

8.    <u>SELLER'S REPRESENTATIVE</u>. Before construction begins, Seller will notify Buyer of the representative it proposes to designate for coordination and oversight of the Zip Line System installation.

9.    <u>CHANGES.</u>

      (a)    Seller will promptly notify Buyer of any material changes which occur prior to the completion of the Zip Line System installation including any matters which affect the Zipline System Price, the component delivery schedule or the Milestone Dates. Notice must be given to Buyer in writing in accordance with Section 19(k).

      (b)    If changes are required in the Contract Documents, the changes must be proposed to Buyer on a Change Order.  Buyer may also propose changes to Seller via Change Order. Seller must inform Buyer of the need for a Change Order within 10 days of determining the need for the proposed change.  Any Change Order must be signed by authorized representatives of both parties to be effective.  If the change affects the System Price, the System Price will be adjusted by good faith negotiation on the basis of the System Price originally established.  If the changes affect the scheduled License Date, the dates will be adjusted to the date agreed upon by both parties.

10.    <u>COMPLETION AND ACCEPTANCE.</u>  When Seller has completed the Zip Line System installation, Seller will notify Buyer in writing that the Zip Line System is ready for inspection.  Upon receipt of the notice, Buyer will promptly cause the Zip Line System inspection to be conducted by a certified inspector (pursuant to regulations issued by the Colorado Department of Labor & Employment).  For the purpose of this Agreement, **"License Date"** means the date on which the Zip Line System has been installed in accordance with the Contract Documents, has been load tested, all defects noted by the certified inspector that are the responsibility of Seller have been corrected and Buyer has been granted a license to operate the Zip Line System for the purpose intended

11.    <u>WARRANTY.</u>  Seller acknowledges that Buyer intends to use the Zip Line System as an important and extensively used zipline system at Buyer's prestigious ski resort known as Vail Ski Resort for use by riders of all different levels. Seller warrants to Buyer that (a) all materials and equipment furnished will be of first class quality and new, and thus will warranty materials and

91812



equipment for a period of two years from License Date (except for normal wear and tear on portions of trolley sheaves, zip line cables and brake systems which are intended to and ordinarily wear in such period), (b) the Work performed under this Agreement will be free from defects and performed in a good and workmanlike manner for a period of two years, and (c) all Work will conform to applicable laws, permits, and regulations. Seller warrants the Zip Line System as described in this Agreement notwithstanding any law, judgment, order, rule or regulation to the contrary. Seller agrees to provide on-going consultation and services, as outlined in Section 2 (g), to ensure safe practices and confirm structural integrity. During the two year warranty period, Seller agrees to promptly remedy any breach of warranty, including promptly repairing or replacing the entire Zip Line System or any Zip Line System materials or parts, and performing all related workmanship and labor at no cost to Buyer. If Seller fails or refuses to redesign, replace or repair any defect in the Zip Line System, Buyer may do so and Seller will reimburse Buyer for the cost of the redesign, replacement or repair. If Buyer encounters any problem with the Zip Line System, Seller will consult with Buyer and use its best efforts to assist Buyer in resolving the problem. This warranty is subject to the following conditions:

(a)     Damage or failure that is the result of course elements not being inspected for structural integrity according to the schedules specified in the written instructions provided when the course is certified and turned over for Buyer's use will not be covered by this warranty.

(b)     Damage or failure that is the result of Buyer's failure to complete course-wide periodic inspection and maintenance in accordance with the standards required by all appropriate governing authorities will not be covered by this warranty.

(c)     Damage or failure that is the result of course elements being used without the supervision of qualified guides will not be covered by this warranty.

(d)     Damage or failure that is the result of neglect, vandalism, severe weather, or natural disasters will not be covered by this warranty.

(e)     Damage or failure that results from inappropriate or unreasonably hard usage by staff or participants, whether under qualified supervision or not, will not be covered by this warranty.

(f)     Ordinary wear that does not compromise the safety or suitability for use of any element will not be covered by this warranty.

(g)     Surface cable corrosion that does not sacrifice the integrity of the cable and cable sag or loss of tension will not be covered by this warranty.

12.     INFORMATION DISCLOSURE.

(a)     Information considered by either party to be proprietary information must be held in confidence by the other party for a period of 5 years from the License Date, unless otherwise agreed to in writing by the parties prior to the expiration of the then-current period of confidentiality. This confidentiality commitment does not apply to any information: (i) known by

91812



8

the receiving party at the time of disclosure without an existing duty of confidentiality to the disclosing party; (ii) generally available to the public; (iii) lawfully disclosed to the receiving party by a third party subsequent to disclosure; (iv) approved in writing by the disclosing party for disclosure by the receiving party; or (v) required by law to be disclosed by the receiving party.  No information relevant to the operation of the Zip Line System will be withheld from Buyer.

(b)     Seller will use its best efforts to notify Buyer in writing of any information that Seller may have concerning the Zip Line System which may have a material effect on the safety, maintenance or servicing of the Zip Line System which comes to the attention of Seller by virtue of any known safety defects in similar retrieval system or any material changes in Seller's policy and procedures with respect to the service and maintenance of the Zip Line System.  The provisions of this subsection will survive the expiration or termination of this Agreement so long as the Zip Line System is being utilized in its present location without substantial modification unless such Zip Line System modification is done by Seller or with Seller's consent.

13.     APPROVAL OF CONTRACTORS AND EMPLOYEES; MECHANIC'S LIENS

(a)     Buyer will have the right to approve of or disapprove of any of Seller's consultants, contractors, subcontractors or employees engaged by Seller in connection with the Work, which approval may be withheld in Buyer's sole discretion.  Prior to the engagement of any consultant, contractor, subcontractor or employee, Seller will provide Buyer with a list of the contractors, subcontractors and employees that Seller intends to engage.  Within 7 days of receipt of Seller's list, Buyer will notify Seller of any disapproval.  If Seller does not receive notice from Buyer within the 7-day period, the list of contractors, subcontractors and employees submitted by Seller will be deemed approved by Buyer.

(b)     Notwithstanding Buyer's approval in subsection (a), Seller agrees it is responsible to Buyer for the acts or omissions of Seller's employees, consultants, contractors, subcontractors and their respective employees and agents, during the course of their respective engagement with Seller in connection with this Agreement.  Buyer will not be obligated to pay any sums to any of Seller's contractors, subcontractors or employees.  Seller will pay and discharge in the ordinary course all amounts due to its contractors, subcontractors and employees in connection with the Work.  Seller will, in its discretion, promptly discharge or "bond over" any mechanics' liens or the like filed by its contractors or subcontractors, and Buyer may withhold the amount of any lien claim from the next payment due to Seller until satisfactory evidence that the lien claim has been resolved or bonded over.

14.     COORDINATION AT JOB SITE. Seller represents that it has visited the Job Site, familiarized itself with the local conditions under which the Work is to be performed and correlated its observations with the requirements of the Contract Documents.  Seller and Buyer understand that there may be other contractors working on and in close proximity to the Job Site.  Seller and Buyer will use their best effort to coordinate the Zip Line System installation with the work of other contractors in order to minimize delays and inefficiencies.  Seller acknowledges that it will not be

91812



entitled to additional compensation or extensions of time from Buyer due to the actions of other contractors working at or around the Job Site.

15.   <u>CLEANUP</u>.

(a)   Seller will keep the areas in and around the Job Site free from accumulation of waste materials or rubbish caused by its operations.  At the completion of the Zip Line System installation, Seller will remove all waste materials and rubbish from and around the Job Site, as well as all of its tools, equipment, machinery and surplus materials.

(b)   If Seller fails to clean up its construction materials and rubbish at the completion of the Zip Line System installation, Buyer may do so and the cost for the cleanup will be deducted from any amounts due to Seller.  If the cost of the cleanup exceeds the amount due to Seller, the cleanup costs will be charged to Seller and Seller will promptly reimburse Buyer for the cleanup costs.

16.   <u>INSURANCE</u>.

**<u>Design Insurance Requirements:</u>**

(a)   <u>Seller's Insurance</u>.  At all times during the design of the Zip Line System, Seller must carry and maintain, at its sole cost, the following insurance policies with insurance companies rated at least A- VII by AM Best and on forms satisfactory to Buyer.

(i)   Commercial General Liability insurance in an occurrence format in an amount of at least ▮▮▮▮ per occurrence, and ▮▮▮▮ in the aggregate, covering liability arising out of premises operations, personal and advertising injury, products-completed operations, contractual liability, independent contractors and underground explosion and collapse hazard.

(ii)   Commercial Auto Liability insurance with a limit of insurance no less than ▮▮▮▮ combined single limit for each accident for bodily injury and property damage covering "any auto" whether owned, non-owned, scheduled, leased, hired or other.

(iii)   Workers' Compensation insurance in accordance with applicable law and Employers Liability insurance with a limit of no less than ▮▮▮▮ each accident for bodily injury, ▮▮▮▮ each employee for bodily injury by disease and ▮▮▮▮ policy limit for disease.

(iv)   Beginning with construction, professional liability insurance covering claims arising out of the acts, errors or omissions of Seller in relation to the Services in the amount of ▮▮▮▮ to include prior acts coverage under a claims-made policy. Seller's professional liability coverage must extend for a period of two years after the completion of the Project.

(b)   <u>General Insurance Provisions</u>.  Seller's insurance required by subsections (i) and (ii) must be primary and non-contributory to any insurance held by Buyer and its affiliates.  Except for Workers' Compensation, Buyer and the Forest Service must be named as an additional insured under the policies.  The policies must include a waiver of subrogation, and Seller must provide Buyer a

10 

Vail Game Creek

copy of the carrier notice of cancellation or notice of changes to policy conditions within five days after the notice is received. Seller must provide Buyer and the Forest Service with certificates of insurance evidencing the policies listed above at least 15 days prior to commencing the Work.

       (c)    <u>Subcontractors</u>. If any portion of the Work is subcontracted, Seller must require the subcontractor to provide the identical insurance listed in Section 15(a). If the subcontractor does not have identical coverage, Seller must name the subcontractor as additional insured on its policies.

**<u>Build Insurance Requirements</u>:**

       (a)    <u>Seller's Insurance</u>. At all times during the manufacture, delivery and installation of the Zip Line System, Seller must carry and maintain, at its sole cost, the following insurance policies with insurance companies rated at least A- VII by AM Best and on forms satisfactory to Buyer.

       (i)    Commercial General Liability insurance in an occurrence format in an amount of at least ▋▋▋▋ per occurrence, and ▋▋▋▋ in the aggregate, covering liability arising out of premises operations, personal and advertising injury, products-completed operations, contractual liability, independent contractors and underground explosion and collapse hazard.

       (ii)    Commercial Auto Liability insurance with a limit of insurance no less than ▋▋▋▋ combined single limit for each accident for bodily injury and property damage covering "any auto" whether owned, non-owned, scheduled, leased, hired or other.

       (iii)    Workers' Compensation insurance in accordance with applicable law and Employers Liability insurance with a limit of no less than ▋▋▋▋ each accident for bodily injury, ▋▋▋▋ each employee for bodily injury by disease and ▋▋▋▋ policy limit for disease.

       (iv)    Beginning with construction, professional liability insurance covering claims arising out of the acts, errors or omissions of Seller in relation to the Services in the amount of ▋▋▋▋ to include prior acts coverage under a claims-made policy. Seller's professional liability coverage must extend for a period of two years after the completion of the Project.

       (b)    <u>General Insurance Provisions</u>. Seller's insurance required by subsections (i) and (ii) must be primary and non-contributory to any insurance held by Buyer and its affiliates. Except for Workers' Compensation, Buyer and the Forest Service must be named as an additional insured under the policies. The policies must include a waiver of subrogation, and Seller must provide Buyer a copy of the carrier notice of cancellation or notice of changes to policy conditions within five days after the notice is received. Seller must provide Buyer and the Forest Service with certificates of insurance evidencing the policies listed above at least 15 days prior to commencing the Work.

       (c)    <u>Subcontractors</u>. If any portion of the Work is subcontracted, Seller must require the subcontractor to provide the identical insurance listed in Section 15(a). If the subcontractor does not have identical coverage, Seller must name the subcontractor as additional insured on its policies.

*V b L*

17.    <u>INDEMNITY</u>.

(a)    <u>General Indemnity</u>.   Seller will indemnify Buyer, its employees, officers, directors, owners, affiliates, agents and assignees and each of their successors-in-interest (each, a "**Buyer Indemnified Party**") from all injuries, losses and liabilities in any way arising from Seller's acts or omissions regarding its scope of Work under this Agreement, except to the extent such injury, loss or liability arises from a Buyer Indemnified Party's negligence or willful misconduct or any material modifications to the Zip Line System or documents made by Buyer after delivery without Seller's written consent (which consent may be withheld for any reason, no reason or arbitrarily).   Upon notice from a Buyer Indemnified Party claiming indemnity for a claim or threatened claim, Seller will assume defense of the claim and retain counsel reasonably satisfactory to the Buyer Indemnified Party.   Buyer Indemnified Party will cooperate as reasonably requested in the defense and reasonable costs and expenses incurred by a Buyer Indemnified Party will be reimbursed by Seller.   At any time, Buyer Indemnified Party may retain counsel and participate in any proceeding at its expense.   If Seller does not assume defense of the claim as to which Seller has a legal duty under this Agreement to assume, Buyer Indemnified Party may retain counsel of its choice at Seller's expense and Buyer Indemnified Party will have control over the defense and authority to resolve the claim.   This Section will survive any termination or expiration of this Agreement.

(b)    <u>Patent Indemnity</u>.   Seller will indemnify the Buyer Indemnified Parties from all injuries, losses and liabilities in any way arising from Seller's alleged infringement of any patent, copyright, trade secret, trademark or other legally protected propriety right of any third party, in connection with the Zip Line System or any part or component of the Zip Line System. If the Zip Line System or any part or component of the Zip Line System is held to infringe, or in Seller's opinion, is likely to be held to infringe, any third party intellectual property right, Seller will, at its expense, secure the right for Buyer to continue use of the Zip Line System or replace or modify the Zip Line System to make it non-infringing; provided that, the replacement or modification yields substantially equivalent results.

(c)    <u>Buyer Indemnity</u>.   Buyer will indemnify Seller, its employees, officers, directors, owners, affiliates, agents and assignees and each of their successors-in-interest (each, a "**Seller Indemnified Party**") from all injuries, losses and liabilities to the extent arising out of Buyer's negligence and willful misconduct or that of its subcontractors or employees while engaged in any activity under this Agreement.

18.    <u>NON-DISCRIMINATION</u>.   Seller will not discriminate (i) against any employee or applicant for employment because of race, color, religion, sex, national origin, age or handicap (Ref. Title VII of the Civil Rights Act of 1964 as amended); and (ii) by segregation or otherwise against any person on the basis of race, color, religion, sex, national origin, age or handicap, by curtailing or refusing to furnish accommodations, facilities, services or use privileges offered to the public generally (Ref. Title VI of the Civil Rights Act of 1964 as amended, Section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendments, and the Age Discrimination Act of 1975).

91812

19.   GENERAL PROVISIONS

(a)   Publicity. Seller may not issue a press release or make a public statement concerning Buyer's award of the Zipline System purchase to Seller or any other terms of this Agreement without the prior approval of Buyer.  The parties acknowledge that Buyer may be required to disclose confidential information pursuant to Securities and Exchange Commission rules and regulations, in which case Buyer will furnish only that portion of the information that it believes in good faith it is legally required to disclose.

(b)   Compliance with Law. In performing its obligations under the Agreement, Seller must comply with all applicable laws, rules and regulations and any of Buyer's policies provided to Seller.

(c)   Authority. Each party represents that (i) it has the corporate power and authority to enter into and perform this Agreement; and (ii) execution or performance of this Agreement does not breach any other agreement.

(d)   Force Majeure.

(i)   Neither party will be liable for any liquidated, direct, indirect, or consequential damages due to delays or inability to perform caused by factors beyond its reasonable control, including acts of God, flood, war, riot, fire, explosion, wildcat labor strikes or acts of Government, with the specific exceptions, however, that weather on the Premises, regulations concerning the Job Site (whether related to noise, construction or otherwise) labor disputes (other than wildcat labor strikes) or a delay in the delivery of the Zipline System or any parts will not be considered justification for delay.

(ii)   If, due to one or more of the events described above for which delay is justifiable, airfreight of some portions of the Zipline System is necessary to complete the project on time, Buyer and Seller agree to split the additional airfreight cost.  If airfreight does not enable Seller to complete the project on time, Seller will receive a reasonable extension of time to complete the project.

(iii)   Subject to Section 9, the parties acknowledge that orders for parts may not be canceled or changed or deliveries deferred.  If Buyer refuses to accept delivery of items reasonably ordered, Seller will be entitled to charge reasonable storage, interest, loading and unloading expenses, extra freight, if applicable, and all other reasonable, direct and actual costs incurred by Seller due to the delay in delivery.

(e)   Governing Law. This Agreement is governed by Colorado law, without regard to its conflicts of laws principles.



(f)    Jurisdiction and Venue. Exclusive jurisdiction and venue for any legal action under this Agreement is the Eagle County District Court or the U.S. District Court for the District of Colorado.

(g)    Remedies Cumulative. The rights and remedies in this Agreement are cumulative and are in addition to all rights and remedies available under law (unless waived in this Agreement). By exercising any right or remedy a party does not waive any other available right or remedy.

(h)    Waiver of Default.

(i)    Failure to insist upon strict compliance with any of the terms, covenants and conditions hereof shall not be deemed a waiver of such terms, covenants and conditions, nor shall any waiver or relinquishment of any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times. No waiver shall be valid unless in writing and signed by authorized officers of the parties hereto.

(ii)    Buyer agrees that Seller may, at its option, accept payments past due, or part payments of monies due without in any manner modifying the terms of this Agreement, that the acceptance of partial payments shall not constitute a waiver of any default created by the failure of Buyer to pay in accordance with the terms hereof, nor shall the acceptance of any sums in full or partial payment of any delinquent installments constitute or be construed as a waiver of time as the essence of this Agreement or of any subsequent defaults of Buyer. Any action to enforce payment of any indebtedness shall not waive any of Seller's rights hereunder.

(i)    Severability. If any part of this Agreement is held invalid in a legal proceeding, then the rest of the Agreement will remain valid.

(j)    Attorneys' Fees. If a party substantially prevails in any legal action under this Agreement the non-prevailing party must pay the reasonable attorneys' fees, experts' fees, costs and expenses of the prevailing party.

(k)    Notices. All notices under this Agreement must be in writing and delivered to the notice address below: (a) in person; (b) by registered, express, or certified mail; (c) by courier or messenger service; (d) by facsimile; or (e) by electronic mail with acknowledgement of receipt. Notice is deemed given on the date delivered or attempted but delivery is refused. Any party may change its notice address by following the requirements in this section.

|  |  |
|---|---|
| If to Buyer: | The Vail Corporation |
|  | Attention:  C.R. Russell |
|  | P.O. Box 959 |
|  | Avon, CO 81620 |

91812

14 

Facsimile: (970) 754-2555
E-mail: crussell@vailresorts.com

With a copy to:              Vail Resorts Management Company
                             Attention:  Legal Dept., Box I-88
                             390 Interlocken Crescent
                             Broomfield, Colorado 80021
                             Facsimile:  (303).404.6422

If to Seller:                Bonsai Design, Inc.
                             Attention:  Thaddeus Shrader
                             2134 Buffalo Drive
                             Grand Junction, Colorado 81507
                             Facsimile: (970) 255-7393
                             E-mail:  thaddeus@bonsai-design.com

For Forest Service
     Insurance Certificate: Don Dressler
                             Natural Resource Specialist (Recreation)
                             Eagle/Holy Cross Ranger District
                             White River National Forest
                             P.O. Box 190
                             Minturn, CO  81645

(l)     Survival. Any agreements, obligations or undertakings in this Agreement which by their terms must be performed or remain in effect following the termination or expiration of this Agreement will survive.

(m)     Amendment. The parties may only alter this Agreement by written amendment signed by the parties.

(n)     Further Assurances. If reasonably requested, any party will sign and deliver any document or take other action necessary to carry out the intent of or to perfect any of the rights granted in this Agreement.

(o)     Time of the Essence. Time is of the essence with regard to all dates and time periods in this Agreement.

(p)     Captions. The captions of each section are for reference only and do not affect the interpretation of this Agreement.

(q)     No Presumption Against Drafter. This Agreement expresses the mutual intent of the parties. Each party has had the opportunity to consult with counsel. Any rule of construction that ambiguities will be resolved against the drafting party does not apply.

91812

15



(r)   Relationship of Parties.  Nothing in this Agreement creates a partnership, joint venture, or similar relationship between the parties.  Neither party may bind any other party or hold itself out as having authority to bind the other party.

(s)   Third-Party Beneficiary.  This Agreement is for the sole benefit of the parties and their successors and permitted assigns, and no other person or entity has any right under this Agreement except to the extent identified in this Agreement.

(t)   Assignment; Successors.  Neither party may assign or delegate its rights or duties under this Agreement, except that Buyer may assign this Agreement to an affiliate.  This Agreement is binding on the successors and permitted assigns of either party.

(u)   Entire Agreement.  This Agreement contains the entire understanding between the parties relating to the subject described and supersedes all prior agreements, whether written or oral, relating to the same subject.

(v)   Counterparts.  This Agreement may be executed in counterparts and delivered by facsimile or other electronic method, which taken together form the Agreement and will be binding as if the original signatures are on one document.

(w)   Termination.  Buyer may terminate this contract without regard to fault or breach of the Seller upon 30 days written notice to Seller.  In the event of such termination, Buyer will pay the portion of the System Price that has been earned prior to the date of termination, including costs for materials actually incurred by Seller.  In no event shall Buyer be responsible for Seller's lost profits, overhead or consequential damages.  Upon any termination of this Agreement, Seller shall deliver to Buyer all of Seller's drawings, plans and similar materials relating to the Work performed under this Agreement within 5 days of termination.

The parties have executed this Agreement as of the Effective Date.

SELLER:                                         BUYER:
BONSAI DESIGN, INC.                             THE VAIL CORPORATION

By: _____                     By: _____

Name: _THADDEUS SHRADER_                         Name: _____

Title: _____CEO_____                            Title: _____

91812

16

(r)     Relationship of Parties.  Nothing in this Agreement creates a partnership, joint venture, or similar relationship between the parties.  Neither party may bind any other party or hold itself out as having authority to bind the other party.

(s)     Third-Party Beneficiary.  This Agreement is for the sole benefit of the parties and their successors and permitted assigns, and no other person or entity has any right under this Agreement except to the extent identified in this Agreement.

(t)     Assignment; Successors.  Neither party may assign or delegate its rights or duties under this Agreement, except that Buyer may assign this Agreement to an affiliate.  This Agreement is binding on the successors and permitted assigns of either party.

(u)     Entire Agreement.  This Agreement contains the entire understanding between the parties relating to the subject described and supersedes all prior agreements, whether written or oral, relating to the same subject.

(v)     Counterparts.  This Agreement may be executed in counterparts and delivered by facsimile or other electronic method, which taken together form the Agreement and will be binding as if the original signatures are on one document.

(w)     Termination.  Buyer may terminate this contract without regard to fault or breach of the Seller upon 30 days written notice to Seller.  In the event of such termination, Buyer will pay the portion of the System Price that has been earned prior to the date of termination, including costs for materials actually incurred by Seller.  In no event shall Buyer be responsible for Seller's lost profits, overhead or consequential damages.  Upon any termination of this Agreement, Seller shall deliver to Buyer all of Seller's drawings, plans and similar materials relating to the Work performed under this Agreement within 5 days of termination.

The parties have executed this Agreement as of the Effective Date.

SELLER:                                         BUYER:
BONSAI DESIGN, INC.                             THE VAIL CORPORATION

By: _____                  By: _____

Name: _THADDEUS SHRADEN_                        Name: _ALEX ISKENDERIAN_

Title: _CEO_                                    Title: _SR. VICE PRESIDENT_

                                                ┌─────────────────────────────────┐
                                                │ Approved as to Form:            │
                                                │ Vail Resorts Legal Department   │
                                                │ Carol Fabrizio                  │
                                                └─────────────────────────────────┘

91812

16

<u>EXHIBIT A</u>

<u>ZIPLINE SYSTEM PLANS</u>

(To be attached)

A-1

A-1



EXHIBIT B

SELLER'S PROPOSAL

**MILESTONES AND PAYMENT SCHEDULE**

The below listed costs cover initial design layout and typical tower concept drawings as necessary for submittal to the Forest Service for the purpose of installation permitting.

| Item | Cost |
|---|---|
| Design launch – overlap with surveyor, accrual of existing Game Creek topography, initial layout analysis and calibration | █████ |
| Layout secondary analysis<br>• Development of elevation views of each zip line,<br>• Sequential depiction with reference to underlying terrain to verify adequate safety margin under entire line length | █████ |
| Termination Tower initial design<br>• Each tower shall be modified as necessary from the typical per the needs of each station. However, each tower shall adhere to the permitted limits of disturbance as defined in the development of a 'typical termination tower'<br>• As necessary, depiction of typical ground based - landing deck design | █████ |
| **Total** | █████ |

These amounts include all design revisions, equipment, labor and material required. Any additional costs required for those items shall be incorporated into a change order in advance of any Work requiring additional cost to Owner.

**Game Creek Zip Line Tour -  Milestones and Payment Schedule**

Upon execution        Design Launch
                            Bonsai may submit payment application for  █████

B-1



Secondary Analysis    Secondary analysis complete and layout delivered to Client
Bonsai may submit payment application for ███████

Estimated date: September 17, 2012

Tower Completion:    Concept design of Termination Tower typical plan developed for both high
and low landing selections
Bonsai may submit remainder of fee - ██████
Estimated date: October 1, 2012

B-2



**Design Deliverables**

1. Development of topographically accurate site plan for Game Creek Zip Line Tour. Plans shall include:

   - Site Plan – Accurate topography & element locations
   - Guide Map
   - Interpretive Map (delivery date TBD)
   - Layout specifics of course access zones
   - If necessary; Element typical 2D for
     - Landing systems layout
     - Belay systems layout

2. Oversight and approval of final design and materials list for Zip Line Tour.
   a. Equipment list – participant (must match max throughput as defined in during design colaboration)
   b. Documentation:
      1. Master flow plan and throughput compliance and verification
      2. Projected operations training & staffing specifications
      3. Operational Specifications*
      4. Training & Rescue Specifications*
      5. Equipment & MX handling Specifications*
      6. Other Applicable Infrastructure needs**
      7. Operational Capacities **
      8. Hazard Analysis and recommendation for future training protocol
         *(as set forth in the Bonsai Design Operations Manual)
         **(sq footage for support buildings, kind & quantity of space, utilities needs, etc)

3. All required on-site and off-site collaboration between Seller personnel and designated Buyer representatives and other adventure consultants as necessary to insure the streamlined production of design materials and construction timeline.

4. Work with surveyors to flag locations of structural elements for Zip Line Tour.

5. If necessary, support for regulatory building approval processes of Component Installation.

B-3



**Services Not Included in Agreement Fixed Price:**

1. Engineering certifications, if required
2. Surveying required for design and installation of Zip Line Tour termination zones and other surveying required for completion of master plan.
3. Building permit fees
4. Initial 3D renderings and construction drawings for tower termination elements and finalized course layout.

**Schedule of Seller's Additional Fees**

| Title of Position | Hourly Rate |
|---|---|
| Principal | |
| Administrative Field Assistant | |
| SERVICES Manager | |
| Lead Installer | |
| Assistant Installer | |
| Ground Laborer | |
| Logistics Coordinator | |
| Lead Designer | |
| Assistant Designer | |
| Lead Trainer | |
| Assistant Trainer | |

NOTE:   Delay fees shall be computed on a daily basis using the above rates for an 8-hour day.  These rates are fixed until December 31, 2013, after which there may be increases to account for employee pay raises and increased overhead costs.

B-4



## EXHIBIT C
### SPECIAL CONSIDERATIONS
### Game Creek Zip Line Tour

### (Attached)

For the design and layout of the Game Creek Zip Line Tour; Seller is solely responsible for all layout and element design, installed systems, and programmatic considerations. Seller shall engage Buyer for programmatic review of element selection. Seller's information provided regarding construction and layout of challenge course installations is proprietary and therefore shall not be used by either company for any third party work in the future.

- Cost overages above and beyond the tentative numbers previously referenced in preliminary design meetings which occur as a result of the augmented design or necessary augmented design of the termination towers shall be mutually agreed upon prior to commencement of any installation services.

- Cost overages incurred from late or additional design review requests and any changes to termination structures shall be assessed separately according to Seller's schedule of fees according to the Agreement.  Buyer shall be responsible for any requests resulting in engineering consultation and subsequent fees.

- Seller has specific and critical understanding of all elements of large Zip Line Tour installations including, but not limited to queue areas, safety zones, space requirements.  Therefore, Seller shall have final say regarding design of the Zip Line Tour element selection and layout as a whole.

- Completion date amendments shall be mutually agreed upon and only reflect reasonable timeframes commensurate with inclement conditions.

- While the costs for Final Design, Project Installation, Safety Equipment Provision, Training and Operational Supervision/Assistance are not covered in this Agreement; it is understood that Seller will be responsible for consultation and provision of these services under separate Change Orders.

- Upon placement, flagging tape, survey markers and tree protection zones installed by Seller must be left undisturbed.

C-1

- Tree removal or pruning within or in proximity to the Project installation areas shall receive prior approval from Seller.  All earth moving machinery, construction equipment and construction should be kept at least 100 feet away from all flagged trees in these areas and outside of all tree protection zones.  Seller must be consulted before undertaking any potentially conflicting activities in these areas.

- The construction of access trails is not part of the Work. However, proper placement of trails is crucial for smooth program operation, safety, and participant traffic flow and is also essential for timely construction of installations. Seller will provide input, consultation and assistance as necessary.  Because the trails are tentatively planned to circulate in and around trees used on the challenge course, specific and special attention must be given to mitigate root compression during trail design layout and construction.

- Seller installations contemplate completion of the Design Phase (including on-site surveys; on-site consultations with land surveyors and foresters; and generation of site specific site drawings, plans and elevations) before the construction can begin.

- Seller shall guide and direct third party contractors services (such as surveyors, foresters and etc.) as stated in the Agreement.

- Once designed, any requisite adjustment or element redesign to accommodate other third party or infrastructure layout needs shall be accomplished under a separate change order.  Such change order services shall be completed using additional services rates as set forth in the Agreement.



C-2

EXHIBIT D

FORM OF CHANGE ORDER

CHANGE ORDER No.

SELLER:  BONSAI DESIGN, INC.
BUYER:  THE VAIL CORPORATION

C.O. DATE:_____ C.O. NUMBER:___ AGREEMENT DATE: _____, 20__

Except as noted herein, all terms and conditions of the Agreement remain unchanged.  The following modifications to the Agreement are to be completed:

This Change Order represents all compensation, time extensions and other claims of Work as outlined above.

Accepted upon the terms and conditions stated herein:

Seller:   BONSAI DESIGN, INC.

By:       _____

Title:    _____

Date:     _____

Buyer:  THE VAIL CORPORATION
By:       _____

Title:    _____

**Internal Approval:   PM:_____PA: _____ Legal:_____**

This C.O.:          $_____

Previous C.O.'s:    $_____

Total C.O.'s to Date: $_____

Original Agmt. Amt.: $_____

Agmt. Amt. to Date:  $_____

Account Number:_____



D-1

## EXHIBIT E

## FORM OF LIEN WAIVER

**LIEN WAIVERS ACCEPTABLE TO BUYER WILL BE PROVIDED TO SELLER UPON SIGNING OF AGREEMENT**

E-1



EXHIBIT F

MILESTONE DATES
(Attached)

       The parties wish to enter into this contract before the Milestone Dates can be reasonably determined.  Consequently, for dates marked "to be determined," the parties will agree in writing on the specified dates and such agreements will be treated as part of this Agreement and Exhibit F.

Proposal Date:                    See Exhibit B

Notice to Proceed Date:         To be determined

Zip Line System Delivery Date:     To be determined

Substantial Completion Date:      To be determined

Inspection Date:               To be determined

Final Completion Date:          To be determined



F-1

EXHIBIT G

Course Commissioning Documentation

[*The example included below is for example purposes only. Nothing in this sample or in the future letter is meant to change the terms of this Agreement in anyway. In the event of any conflict between this sample (or the letter that is ultimately issued) and this Agreement, the terms of this Agreement shall control.*]

Date

Client

Client's Address

Subject:
Client – Tour Name: official course handoff and operational liability notification

Attn – Client

Bonsai Design, Inc. (BDI) truly appreciates and has enjoyed the opportunity to provide a world class Zip Line Tour installation for the enjoyment of Client's participants. It has been a pleasure working with you on this project.

Please allow this communication to serve as the notification regarding the official end of the installation phase and associated installation contract obligations for these elements. This communication marks the complete handover of fully operational status of the Tour Name located at Tour Address.

It is the ongoing responsibility of Client to monitor, assess and notify BDI of any suspected maintenance issues unassociated with normal wear and tear the course may sustain. However, BDI shall contact Client as necessary for regularly scheduled course inspections.

Again, thank you for the opportunity to work together on this project. Please Contact BDI with any future questions and/or opportunities. Enjoy and have a prosperous season.



**BDI - STANDARD SYSTEM DISCLAIMER**:

**CAUTION**:  Do not operate or use the zip-line or other system ("System") designed and installed by Bonsai Design, Inc. ("Bonsai"), for you until you have reviewed the following statements:

1.       The Bonsai System is a high performance product and should be used at the consumers' own risk.  Notwithstanding anything appearing to the contrary anywhere else in the contract documents, operations manual or other written or spoken statements by any Bonsai employee or representative, Bonsai does not act as a guarantor or insurer to any user of the System that such user will not be injured during use, whether such use is operational or as an ultimate consumer.

2.       Bonsai has provided, or will provide, a basic set of minimum standards for operation and use of the System.  Operators and Users are responsible for following any of these standards; however, these standards are provided by Bonsai as a set of minimum recommended standards for operation and use, based on Bonsai's experience and training.  **THESE STANDARDS ARE NOT INTENDED TO BE ALL ENCOMPASSING AND THERE MAY BE OTHER OR DIFFERENT METHODS OF OPERATION AND USE THAT ARE NOT INCLUDED WHICH MAY NONETHELESS BE REASONABLE**.  Even if followed, Bonsai's recommendations are not warranties against any possible injury, and all users of the System (both operators and ultimate consumers) should use reasonable judgment about when and how to use the System.  Bonsai is not responsible for any operator or ultimate consumer's safe use of the System.

3.       Intentionally omitted.

4.       Your operation or use of the System shall be conclusively deemed your agreement to the terms stated above.

<u>COMMISSIONING AND ACCEPTANCE INSPECTION PROTOCOL</u>

1. DEFINITION:  Course commissioning means both of the following:
    a. The process of assuring that all systems, components operational protocols, etc. of a new, or modified, or significantly impacted program installation or operation have undergone proper and sufficient testing and verification for the purpose of ensuring initial or continued safe operation.
    b. A formal transfer of responsibility for the course and its operation from the design-installation entity to the operational entity.
2. INTENT:  To provide sufficient testing, inspection, and objective review in order to justify the advancement to course operations, and to clarify and make transparent the transfer of responsibility of the installation to the operator.  To allow space for unforeseen issues may be resolved prior to ensuing operations.
3. SCOPE:  This document covers all instances of commissioning of Bonsai-installed operational programs or "courses".  These instances are for both newly installed programs, elements, or components, as well as any significant modifications to any system on existing courses.  Operators may consider application of this standard to existing operations when significant impact or changes occur which would merit re-assessment of conditions prior to continued operation.
4. GENERAL CONSIDERATIONS:
    The commissioning process is composed of two parts: the "Acceptance Inspection" and the



G-2

"Objective Review".  The Objective Person must be a Qualified Person (as defined below).

It should be understood that the final criteria and methods for commissioning will fluctuate slightly based on the type of installation, the level of vigilance in the design, manufacture and installation, the experience level of the design firm with similar designs, the installed environment, and the general risks that the installation poses to participant safety.  Each commissioning process will require consideration for context, and for the entire set of circumstances, and will require a commitment to quality communications between all parties involved.

5.  TERMINOLOGY:

**Qualified Person:**  An individual with sufficient training, expertise, and successfully demonstrated ability in the discipline required and in the type of program being reviewed.

**Objective Person:**  The person responsible for the Commission Review and not involved directly with the project or with operations.

**Critical Systems:** Systems and components that are critical to life safety

**LAPE:**  Landing Area Protective Equipment such as pads and bumpers.

**Operational:** Functioning correctly and safely – Tested complete to a the minimum degree

**Finalized:**  Needing no changes or improvements; In final condition; Testing complete and final

6.  DOCUMENTATION

**Installation Review:** An internal checklist endorsed by the Qualified Person(s) representing completion of the Acceptance Inspection.  The report also includes all of the required associated documentation (engineering documents, material specifications, testing charts, etc.)

**Internal Developmental Testing:**  Testing that is performed during the design and engineering phase of a system or component that is intended to be incorporated in a future program.

**Internal Performance Testing:**  Testing required verifying that an installed system or component is performing correctly as it has been engineered.

**Installation Report:**  A comprehensive review of the course condition, and the associated required documentation, performed by a Qualified Person(s)

**Notification Letter:** The official hand off of operational liability to the client.

**State Documentation:**  Relevant Sate Approval and/or Building Department Inspection Documentation.

7.  LEVELS of ACCESS – for types of participants with associated requirements.

    5.1.  LEVEL #1 - OWNERS, PARTNERS, or QUALIFIED SENIOR OPERATIONS STAFF

        a.  COMPLETE
   i.  Initial ground inspection
   ii.  Communication to Objective Person

        b.  MAY NOT BE COMPLETED
   i.  Acceptance Inspection
   ii.  Commission Review
   iii.  Arborist review
   iv.  Critical cable Systems Operational
   v.  Zip Corridors Operational
   vi.  Critical rope Systems Operational
      a.  Knots tied correctly
   vii.  Critical Brake Systems Operational
   viii.  Rescue bags at each station
   ix.  LAPE Operational
   x.  Step systems and ramps Operational
   xi.  Trails Operational



G-3

       xii.   Final Corridor Pruning
      xiii.   Final Torqueing

## 5.2. LEVEL #2 - TRAINEES OR NON-PAYING GUESTS

  a.  COMPLETE
        i.   Acceptance Inspection
        ii.   Critical cable Systems Operational
      iii.   Zip Corridors Operational
      iv.   Critical rope Systems Operational
       v.   Critical brake Systems Operational
      vi.   Final Corridor Pruning
     vii.   Final Torqueing
    viii.   Rescue bags at each station
      ix.   LAPE Operational
       x.   Step-systems Operational
      xi.   Trails Operational

  b.  MAY NOT BE COMPLETED
        i.   Commission Review
        ii.   Arborist Document
      iii.   Critical Systems Finalized
      iv.   Zip Corridors Finalized
       v.   Landing Area Finalized
      vi.   Step Systems Finalized
     vii.   Trails Finalized

## 5.3. LEVEL #3 - PAYING GUESTS

  a.  COMPLETE
        i.   Acceptance Inspection
        ii.   Commission Review
      iii.   Arborist Document
      iv.   All Critical Systems Finalized
       v.   Zip Corridors Finalized
      vi.   Rescue bags at each station
     vii.   LAPE Finalized
    viii.   Step-systems Finalized
      ix.   Trails Finalized
       x.   Tensions finalized and measured
      xi.   All fist grips torqued to proper specifications

G-4

Design and Build

FORM OF CHANGE ORDER

CHANGE ORDER No. 1

SELLER:  Bonsai Design Inc.
BUYER:  The Vail Corporation

C.O. DATE: 10/3/2013 C.O. NUMBER: 1 AGREEMENT DATE: September 19th, 2012

Except as noted herein, all terms and conditions of the Agreement remain unchanged.  The following modifications to the Agreement are to be completed: Site analysis, soil sampling, laboratory analysis and anchor recommendations as outlined in Bonsai Design's September 27th proposal for the Game Creek Canopy Tour.

This Change Order represents all compensation, time extensions and other claims of Work as outlined above.

Accepted upon the terms and conditions stated herein:

Seller:  Bonsai Design Inc.

By:

Title:  CEO

Date:  10 . 4 . 13

Buyer:  The Vail Corporation
By:

Title:

| | |
|---|---|
| This C.O.: | ■■■■ |
| Previous C.O.'s: | ■ |
| Total C.O.'s to Date: | ■ |
| Original Agmt. Amt.: | ■■■■■ |
| Agmt. Amt. to Date: | ■■■ |

Account Number: 2V058-005

Internal Approval:   PM: ____   CR ____   PA:  CEF ____   Legal: jks



201 South Ave.
Grand Junction, CO 81501
Office - 970-255-7393 // Fax - 970-255-6741
bonsai-design.com

September 27, 2013

C.R. Russell
Vail Resorts Development Company
137 Benchmark Rd.
Avon, CO 81620

**Vail Resort-Game Creek Zip Line Tour**

The below listed cost covers site analysis, sample collection, laboratory testing and anchor design specific to each location.  As soil conditions vary from site to site, site layout and anchor placement will be specific to each site.  Stamp and engineered anchor options will be provided per load specifications upon completion.

| Item | Cost | |
|---|---|---|
| Site analysis, sample collection, laboratory analysis, anchor selection and design. | ██████ | |
| **Total** | ██████ | |

Design and Build

FORM OF CHANGE ORDER

CHANGE ORDER No. 2

SELLER:  Bonsai Design Inc.
BUYER:  The Vail Corporation

C.O. DATE:<u>3/20/2014</u> C.O. NUMBER:<u>2</u> AGREEMENT DATE: September 19th, 2012

Except as noted herein, all terms and conditions of the Agreement remain unchanged.  The following modifications to the Agreement are to be completed: Revise Game Creek Alignment and modify tower design based on request from VR to modify launch/landing location.

This Change Order represents all compensation, time extensions and other claims of Work as outlined above.

Accepted upon the terms and conditions stated herein:

Seller:  Bonsai Design Inc.

By: _____

Title: _____CEO_____

Date: ____3 · 21 · 14____

This C.O.: ▮▮▮

Previous C.O.'s:

Total C.O.'s to Date: ▮▮▮

Original Agmt. Amt.: ▮▮▮

Agmt. Amt. to Date: ▮▮▮

Buyer:  The Vail Corporation

By: _____

Title: __SR. VICE PRESIDENT__

Date: ____J-25-14____

Account Number:<u>2V058-005</u>

Internal Approval:  PM: _C.R. Russell_ PA: _Miriam Lang_ Legal: _jks_



201 South Ave.
Grand Junction, CO 81501
Office - 970-255-7393 // Fax - 970-255-6741
bonsai-design.com

## Proposal
### Game Creek Start Tower Relocation

**Vail Resort-Game Creek Zip Line Tour**

This proposal is for a redesign fee for the request to relocate the start and finish tower Zip Tour. Due to the requested move all towers will need to be reanalyzed and adjusted as necessary. This change order will cover the costs of delivering a set of design phase 1 documents that meet the new layout criteria.

### Design Phase 1:

1) On-site collaboration between BONSAI and CLIENT
2) Administration and oversight of 3rd party service providers including engineer, surveyor, and any other professional consultants as necessary
3) Survey of course element locations, including suitability for use, ground conditions, and finalized horizontal and vertical locations
4) Locations of structural elements surveyed and flagged at ground level
5) Course "layout" or map with locations and specification of individual element difficulty and flow
6) Drawings
    a. Site Plan Layout – accurate layout and proximity to estimated property lines
    b. Pole based platforms – elevation and plan drawings as necessary for field installation
    c. If necessary, drawings to turn over to 3rd party to finalize for engineering approvals
    d. Braking, belay and trolley systems as necessary for fabrication and for ACCT and ASTM standards compliance
7) Master Flow Plan for program
    a. Rough location of gathering areas and pathways required to support the programs
    b. Recommendations as necessary for transportation specifications: pathways and vehicles or equine usage
    c. Participant volume estimates
    d. Staffing requirements
    e. Consultation and assistance in rough location and/or specifications of other infrastructure requirements such as check-in, gear-up and orientation facilities, maintenance and staff facilities, vehicle storage and transportation facilities, etc.
8) Brake-testing as necessary for ACCT/ASTM standards compliance
9) Support for approval processes
10) Installation contract including provisions for Training and Safety Equipment
11) Program descriptions and specifications – To be delivered upon course installation completion
    a. Course specific operational specifications
    b. Training and rescue program outline
    c. Equipment maintenance and handling specifications
    d. Selected operational recording document templates

### *Fees and Payment*

CLIENT shall pay BONSAI the sum of ▮▮▮▮ to carry out the proposed services.  CLIENT shall remit payments to BONSAI according to the schedule below.  CLIENT understands that significant design and installation delays may occur due to required rescheduling of services while land use agreement is being negotiated.  BONSAI agrees to hold the below projected design dates in reserve until March 25, 2014.

Design and Build

FORM OF CHANGE ORDER

CHANGE ORDER No. 3

SELLER: BONSAI DESIGN INC.
BUYER: THE VAIL CORPORATION

C.O. DATE: 4/24/14   C.O. NUMBER: 3   AGREEMENT DATE: September 19, 2012

Except as noted herein, all terms and conditions of the Agreement remain unchanged.

1.  The System Price will be increased in the amount of ███████ which represents additional funds for Phase 2 Design which includes Drafting, Engineering, and Final Survey Reviews as better defined in the attached Exhibit A Bonsai Proposal.

2.  Change in the Project Construction Schedule: No change to schedule.

This Change Order represents all compensation, time extensions and other claims of Work as outlined above.

ACCEPTED UPON THE TERMS AND CONDITIONS STATED HEREIN:

SELLER: BONSAI DESIGN, INC.

By: _____

Title: THADDEUS SHRADER

Date: 4/30/14

BUYER: THE VAIL CORPORATION

By: _____

Title: Sr. Vice President

Date: 5-5-15

| | |
|---|---|
| This C.O.: | $ ███████ |
| Previous C.O.'s: | $ ███████ |
| Total C.O.'s to Date: | $ ███████ |
| Original Contract Amount: | $ ███████ |
| Contract Amount to Date: | $ ███████ |

Accounting Information Only:

Total Costs under 2V058   $ ███████
  - *Original Contract*
  - *Change Order #1*
  - *Change Order #2*

Total Costs under 4VS11   $ ███████
  - *Change Order #3*

Account Number for this CO: 4VS11

Internal Approval:

PM: C.C.      Legal: jks      PA: MRL



201 South Ave.
Grand Junction, CO 81501
Office - 970-255-7393 // Fax - 970-255-6741
bonsai-design.com

## Exhibit A
### Design Phase 1 and 2 Deliverables and schedule of Values

**Vail Resort-Game Creek Zip Line Tour**

Design Phase 1 and Design Phase 2 costs are listed below.   Design Phase 1 is complete and Change Order #2 is for a Design Phase 2 costs.

<u>Design Phase 1:</u>

1) On-site collaboration between BONSAI and CLIENT
2) Administration and oversight of 3rd party service providers including engineer, surveyor, and any other professional consultants as necessary
3) Survey of course element locations, including suitability for use, ground conditions, and finalized horizontal and vertical locations
4) Locations of structural elements surveyed and flagged at ground level
5) Course "layout" or map with locations and specification of individual element difficulty and flow
6) Drawings
   a. Site Plan Layout – accurate layout and proximity to estimated property lines
   b. Pole based platforms – elevation and plan drawings as necessary for field installation
   c. If necessary, drawings to turn over to 3rd party to finalize for engineering approvals
   d. Braking, belay and trolley systems as necessary for fabrication and for ACCT and ASTM standards compliance
7) Master Flow Plan for program
   a. Rough location of gathering areas and pathways required to support the programs
   b. Recommendations as necessary for transportation specifications: pathways and vehicles or equine usage
   c. Participant volume estimates
   d. Staffing requirements
   e. Consultation and assistance in rough location and/or specifications of other infrastructure requirements such as check-in, gear-up and orientation facilities, maintenance and staff facilities, vehicle storage and transportation facilities, etc.
8) Brake-testing as necessary for ACCT/ASTM standards compliance
9) Support for approval processes
10) Installation contract including provisions for Training and Safety Equipment
11) Program descriptions and specifications – To be delivered upon course installation completion
   a. Course specific operational specifications
   b. Training and rescue program outline
   c. Equipment maintenance and handling specifications
   d. Selected operational recording document templates

<u>Design Phase 2:</u> *(Cost Exclusions in Design and Build master agreement until signing of Change order for the design phase 2.)*

1) Review Design Phase 1 documents prior to submission to engineer
2) Detailed drawings or detailed specifications for course elements
3) Third party wet stamps or other engineering approvals
4) BDI will provide up to 2 printed sets of documents for the purpose of standards approval if requested.



201 South Ave.
Grand Junction, CO 81501
Office - 970-255-7393 // Fax - 970-255-6741
bonsai-design.com

*Fees and Payment*

CLIENT shall pay BONSAI the sum of ▇▇▇ to carry out the proposed services. CLIENT shall remit payments to BONSAI according to the schedule below. CLIENT understands that significant design and installation delays may occur due to required rescheduling of services while land use agreement is being negotiated. BONSAI agrees to hold the below projected design dates in reserve until May 25, 2014.

**Design Phase 2 / Change Order 2 payment installments.**

(1)   **First Installment:** ▇▇▇
Due upon execution of change order #2.
Projected date: April 25, 2014.

(2)   **Second Installment:** ▇▇▇
Due upon completion of 1st Milestone: Deliverables 1 – 2 completed
Projected date: May 25, 2014

(3)   **Final Installment:** ▇▇▇ Estimated
Due upon completion of proposed services: Deliverables 3 - 4 completed
Projected date: June 25, 2014

| Design Phase 2 | | | |
|---|---|---|---|
| BDI Design Phase 2 Drafting | | ▇▇▇ | |
| BDI Design Phase 2 Engineering and Final Survey Reviews | | ▇▇▇ | |
| **Design Phase 2 Total** | | ▇▇▇ | |
| | | | |
| **Total** | | ▇▇▇ | |

TS

**Design and Build**

**FORM OF CHANGE ORDER**

**CHANGE ORDER No. 4**

SELLER:  BONSAI DESIGN INC.
BUYER:  THE VAIL CORPORATION

C.O. DATE: 7/23/2014        C.O. NUMBER: 4      AGREEMENT DATE: September 19, 2012

Except as noted herein, all terms and conditions of the Agreement remain unchanged.

1.  The System Price will be increased in the amount of ███ which represents additional funds for Phase 2 Design which includes additional design and engineering work defined within the attached proposal.

2.  Change in the Project Construction Schedule: No change to schedule.

This Change Order represents all compensation, time extensions and other claims of Work as outlined above.

ACCEPTED UPON THE TERMS AND CONDITIONS STATED HEREIN:

SELLER:  BONSAI DESIGN, INC.

By: _JOHN WALKER_

Title: _PRESIDENT_

Date: _7.24.2014_

BUYER: THE VAIL CORPORATION

By: _____

Title: _SR. VICE PRESIDENT_

Date: _7.25-14_

This C.O. under (4VS11):  $___

Previous C.O.'s:       $___

Total C.O.'s to Date:    $___

Original Contract Amount: $___

Contract Amount to Date: $___

Accounting Information Only:

Total Costs under 2V058   $___
- *Original Contract*
- *Change Order #1*
- *Change Order #2*

Total Costs under 4VS11   $___
- *Change Order #3*
- *Change Order #4*

Account Number for this CO: 4VS11

Internal Approval:

PM: _CC_      Legal: _jko_     PA: _MRL_



201 South Avenue
Grand Junction, CO 81501
Office - 970-255-7393 // Fax - 970-255-6741
www.bonsai-design.com

## DESIGN SCOPE CHANGE

This scope change is an extension of the Change Order No.3 and shall fall under Change Order No.4.

The parties hereby agree that the terms of this change order shall be as described herein and that this change order is bound by the terms of AGREEMENT as it is an extension of such. All other provisions of the AGREEMENT shall remain in full force and effect.

Synopsis:   CLIENT has, throughout the engineering phase, requested reasonable updates to both large scope (addition of sky bridge and towers), and small scope items (guy wire placement and or removal), which have caused the contracted engineering firm (K2) to run above the estimated hours in the original contract. This change order is designed solely to compensate the engineering entity for resultant hourly overages, and for finalizing the most recent change requests from CLIENT. However, BUILDER has and shall continue to complete all design services in accordance with the signed contract without additional fees.

**CHANGES.** The parties agree to the changes as described below.

1. In defining the course layout through verbal discussions and plan set review, BUILDER completed a design for one single Sky Rider Zip Line Tour, with a single fire-tower-type tower that allows for course start and course completion from the same tower. BUILDER and CLIENT agree now herewith to change this provision to account for a similar tower as is at G1 station to be located at G5 station and for that tower to be re-located closer to the lift station at an area specified by BUILDER and approved by CLIENT.
   - REQUIRED ADDITIONAL ENGINEERING:
     i. G5 Ground location move requires higher tower to maintain same catenary curve clearance above ground
     ii. Steel truss re-engineered to carry longer zip line load
     iii. Catenary clearance analysis for clearance along entire length
2. Through verbal discussions, CLIENT also requested and has received additional course layout modifications, which have caused additional engineering analysis outside original delivered scope at outset of engineer's estimate. These include:
   - Elevation gain at Ouzo Glades; add additional tower station at G6.5 and sky bridge in leu of previously engineered spiral staircase
   - Guy wire ground termination locations moved closer to towers at all locations to allow increased skier traffic closer to towers
   - Fire tower roof addition (bonsai covers all architectural design work in original agreement, however engineering analysis for wind loading, etc was required)
   - Analysis of concrete anchor option at several locations (BUILDER recognizes that on July 7 CLIENT verbally notified not to complete this effort, however the engineer had been made aware of the request and completed preliminary analysis).

**The added scope within this proposal is** ▮▮▮▮ **in additional funds.**

▲ PRODUCT DEVELOPMENT ▲ DESIGN ▲ INSTALLATION ▲ TRAINING ▲ INSPECTION ▲ MAINTENANCE ▲

# AMENDMENT TO DESIGN AND BUILD AGREEMENT

## VAIL GAME CREEK CANOPY TOUR
## AERIAL ADVENTURE COURSE
## MODEL NAME: Sky-Rider™ Zip Line Tour

### Project No. 5VS03

THIS FIRST AMENDMENT TO DESIGN AND BUILD AGREEMENT ("**Amendment**") is made as of the 23rd day of February, 2015 ("**Effective Date**"), between THE VAIL CORPORATION, a Colorado corporation d/b/a Vail Associates, Inc. ("**Buyer**") and BONSAI DESIGN LLC, a Colorado limited liability company ("**Seller**"), who agree as follows:

      1.    <u>Recitals</u>. This Amendment is executed in contemplation of the following facts and circumstances:

      a.    Buyer and Seller executed a Design and Build Agreement dated September 19, 2012 (the "**Original Agreement**"), pursuant to which Buyer engaged Seller to construct that certain project known as (the "**Zip Line System**") hereinafter referred to as (the "**Aerial Adventure Course**").

      b.    It is the intent of Buyer and Seller, by this Amendment, to amend and modify certain of the provisions and conditions of the Original Agreement.

      c.    It is the intent of Buyer and Seller that except as expressly amended, modified or supplemented by the provisions and conditions of this Amendment, the Original Agreement and the Contract Documents shall remain in full force and effect.

      d.    Capitalized terms not specifically defined herein shall have the same meanings ascribed thereto in the Original Agreement.

      2.    <u>Definitions</u>. For definitional purposes pursuant to Paragraph 1 of the Original Agreement, this Amendment shall constitute one of the Contract Documents. from and after the Effective Date, all references in the Contract Documents to "this Agreement" "the Agreement" and "the Contract" shall mean the Original Agreement as amended by this Amendment.

      3.    <u>Scope of Services.</u>

      a.    <u>Course Installation.</u>
- Seven zip line tour with one ski bridge, 2 wooden and 7 steel operations towers, 2 Entry Sky-Stairs and 2 Rappel Stations;
- Course to be installed as specified in Construction drawings as delivered and dated February 20, 2015;
- 3rd party inspections of ground compaction, concrete, etc.;

1

    b.    <u>Safety Equipment</u>.
- 108 Participant Equipment Sets;
- 22 Guide equipment sets;
- 9 emergency take-down bags;

    c.    <u>Training</u>.
- Guide Training – Lead Guide Track (2 classes of candidates): 40 hours of formal instruction for a group of up to 10 candidates, 10 hours of assessment including a written exam and on-course skills demonstrations. This program will be conducted by two instructors.
- Program Start-Up Oversight and Operations Consulting: 40 hours on site spread over the first 7 days of program operation, including supervision and coaching of guide staff and operations consulting with program managers and supervisors.
- Guide Assessment and Certification: Written evaluations and recommended development plans for each trainee. Certificates of qualification for those guides whose performance at the end of training meets the required standards. Only trainees whom Seller's trainers have observed directly will be eligible for certification.

    d.    <u>Documentation</u>
- Commissioning Binder which includes all necessary documents to meet ACCT and ASTM Standards for Installation and Commissioning;
- Acceptance Inspection;
- Sky-Rider Operations Manual which includes:
  - Operational Protocols;
  - Restrictions and limitation of course operations;
  - Final Course Layout diagram showing the position of each course element;
  - Written instructions for routine maintenance and inspections.

    e.    <u>Field-Fit Process</u>

Seller's installation will adhere to current design and engineered plans. Field-Fit design may be necessary to achieve the total scope of course installation services while ensuring that the course will operate correctly. Field-Fit components of the course may need to be adjusted during installation, including re-location or other modifications of components. If the adjustments are minor and do not materially affect the course design, Seller will make these adjustments in order to accomplish the objective of installation of an effectively operating course. Buyer will include the correct adjustments in the final "As-Built" documents as provided after course completion. If there are material adjustments or changes, Seller must receive formal written approval from Buyer prior to making such changes or adjustments.

2

4.   Food and Lodging.

- Seller will provide for all travel and foods/meals associated with the services.
- The parties will work together to coordinate lodging for Seller staff during the project.
- At all times during services, Buyer may provide lodging as it so chooses;
- Buyer will directly reimburse Seller for Seller's lodging costs of

- For all lodging that Buyer provides, Seller will discount its billing in order to provide a savings on the total cost of lodging;
- In the event that Buyer provides lodging, the following criteria must be met:
  - Reasonably furnished accommodations with beds, couches, tables, etc.
  - At least one kitchen with accessories sufficient to allow all tenants to cook all meals;
  - Wireless internet service with bandwidth for 4 users at a time;
  - Individual and private bedrooms to accommodate one-person occupancy for 5 rooms; and two-person occupancy for 4 additional rooms;
  - Be in close proximity to the build site;
  - The provided lodging must be dedicated solely to Seller's staff for the duration of the project and must not be exchanged for other lodging during the project.

5.   Exclusions and Buyer Responsibilities.

- Seller's Services will require the support and involvement from Buyer. Seller will request meetings in order to effectively make decisions during ongoing installation. Buyer will ensure that its staff is involved to the degree necessary to ensure decisions are made to allow forward progress of design.
- Prior to commencement of the Project, Buyer will provide the following:
  - Easy and continuous access to the Project Site;
  - Physical staking that shows property lines if necessary;
  - Access to each tower station that meets the following criteria:
    - a.   8-10 feet wide;
    - b.   Trail installation as necessary;
    - c.   Lodging where Buyer so chooses;
- Exclusions  The following items will not be included in the scope of Seller's Services:
  - Installation that is not included in the course such as: transport roads, hiking trails, to, from or between the course elements;

3

- o  Installed access and tree clearing of course tower stations will be the responsibility of Buyer;
- o  Seller's installation services are for the Aerial Adventure Course and not for the associated site infrastructure. Installation of associative buildings, restrooms, roadways, security and access to and from the course are all the responsibility of Buyer. Seller will provide general consultation of these areas but will provide no direct services for these essential items.
- o  The installation of course ground trails, other than a conceptual layout of the trails is not included in the scope of these services.

6. <u>System Price</u>.

a.  At the time that Buyer and Seller entered into the Original Agreement, the parties had not provided a Build Price for the Aerial Adventure Course in anticipation of certain costs and approvals which would be made apparent and necessary for the project.

b.  Buyer and Seller wish to commence construction of the Aerial Adventure Course and agree to the Build Price, and collectively with the Design Price, the "**System Price**" of the Aerial Adventure Course and set a payment schedule. Buyer and Seller mutually agree Buyer will pay Seller ███████████████████ to construct the Aerial Adventure Course (the "**Build Price**").

(i)  The System Price to date is summarized as follows:

**Design Price:**
**Build Price:**
**System Price to date:** ██████

c.  <u>Reimbursables</u>.  Out-of-pocket expenses reasonably anticipated to be incurred by Seller for the Aerial Adventure Course are included in Seller's compensation, will be reimbursed (without any additional mark-up thereon) by Buyer after they are incurred, and shall not exceed $█████ Any unused reimbursable expenses shall be returned to Buyer.

d.  <u>Payment Schedule</u>.  If the Aerial Adventure Course is completed in a 36 week timeframe, payments will be as follows:

i.  Buyer shall pay Seller ██████ as a First Installment after the mutual signing of this Amendment. Seller shall provide Buyer with an invoice in the amount of █████ in accordance with the payment terms of the Original Agreement.

ii.  Buyer shall pay Seller ██████ as a Second Installment upon completion of the item and percentages listed below. Seller shall provide Buyer with an invoice in the amount of █████ in accordance with the payment terms of the Original Agreement.

4

- Steel Tower Fabrication – 80%
- Wood Tower Frame Material Acquisition – 100%
- Wire Rope and Hardware Acquisition – 80%

iii.     Buyer shall pay Seller ████████ as a Third Installment upon completion of the items and percentages listed below. Seller shall provide Buyer with an invoice in the amount of ████████ in accordance with the payment terms of the Original Agreement.

- All fabrication complete and materials ordered – 100%
- Anchor installation – 25%
- Wood tower installation – 75%

iv.     Buyer shall pay Seller ████████ as a Fourth Installment upon completion of the items and percentages listed below.  Seller shall provide Buyer with an invoice in the amount of ████████ in accordance with the payment terms of the Original Agreement.

- Wood tower installation – 100%
- Steel tower installation – 75%
- Zip line installation – 50%
- Belay and brake systems, bridges, elements – 50%

v.     Buyer shall pay Seller ████████ as the Final Construction Installment upon final inspection and approval by Buyer, receipt of a final letter from Seller's Colorado licensed construction engineer stating that design of the Aerial Adventure Course meets F24 Standards and final course commission and acceptance from The Colorado Department of Labor and Employment, Division of Oil and Public Safety and the United States Forest Service. To the extent Seller is required to make changes to the Aerial Adventure Course due to changes in the Colorado Department of Labor and Employment, Division of Oil and Public Safety and United States Forest Service Standards where the Standards are changed after the time this agreement is executed, Seller is entitled to additional compensation to accommodate such changes.

vi.     Buyer shall pay Seller ████████ as a Training Installment upon completion of training and receipt of rescue and operation training certificates, as applicable.  Seller shall provide Buyer with an invoice in the amount of ████████ in accordance with the payment terms of the Original Agreement.

All savings associated with the estimated not to exceed reimbursable amount listed in Section 6.c. Reimbursables (Meals and Lodging) shall be reflected within the invoice amount.

All payments are subject to the terms of paragraph 18(a)(w)[sic] of the Original Agreement.

7.     <u>Continued Compliance</u>.   Seller is obligated to ensure that the Aerial

5

Adventure Course meets the requirements of the Colorado Department of Labor and Employment, Division of Oil and Public Safety for a minimum of one year from the License Date. To the extent Seller is required to make changes to the Aerial Adventure Course due to changes in the Colorado Department of Labor and Employment, Division of Oil and Public Safety and Forest Service Standards where the Standards are changed after the time this Amendment is executed, Seller will be entitled to reasonable additional compensation to accommodate such changes.

8.    <u>Storage of Materials</u>:  Seller shall be responsible for all storage costs of materials procured in the Spring/Summer of 2015.

9.    <u>Build Insurance Requirements</u>. Pursuant to Paragraph 16 of the Original Agreement, the "Build Insurance Requirements" would commence upon construction. The parties agree that the Build Insurance Requirements for Paragraph 16(a)(i) is omitted in its entirety and replaced with the following language:

"(i)    <u>Commercial General Liability Insurance in an occurrence format in</u> an amount of at least ███████ per occurrence, and ███████ in the aggregate, covering liability arising out of premises operations, personal and advertising injury, products-completed operations, contractual liability, independent contractors and underground explosion and collapse hazard."

10.    <u>Miscellaneous Provisions</u>.

a.    Work Standards and Project.  Seller recognizes that certain local and Buyer rules and regulations will govern its activities on the project site. Seller agrees to attend all pre-construction and regular weekly meetings and will ensure that during the provision of its services Seller meets all applicable regulatory requirements such as OSHA and work-at-height, as well as Buyer's on-site rules and regulations.

b.    Project Control and Commissioning.  Buyer hereby acknowledges that the control and operation of the course involves inherent risk of physical injury to participants and staff. In order to mitigate foreseeable risk and establish controlling entities, Buyer and Seller agree to follow Seller's commissioning process and to follow the term(s) of the Design and Build Agreement that relate to this provision.

c.    Delivery of Construction Materials.  Seller shall provide delivery of its materials directly to the tower station and other on-mountain staging locations. Buyer will provide at least two strategic staging areas as will be required for Seller to stage its materials. Seller will specify its requirements and coordinate with Buyer to ensure proper staging is available.

d.    Construction Facilities.  Buyer shall provide the following on site facilities to Seller:

i.      Adequate on-mountain staging areas for the project;
ii.     Office space at the Eagle's Nest area if possible;
iii.    Access to any available on-mountain internet;

e.    Electricity and Fuel.  Seller will provide its own generators for installation work out on course. Buyer may provide Seller access to its on-mountain fuel

6

reserves if it so chooses, and in the case of these provisions, Seller will track its fuel use and will reimburse Buyer for all fuel used and in the case of these provisions, Seller will track its fuel use and will reimburse Buyer for all fuel used under the Not to Exceed Reimbursable Amount.

f.      Security and Storage.  Seller will provide its own secure storage for tools and equipment for the duration of project.  Buyer will ensure that the total project site is reasonably secure from theft and vandalism and ensure no unauthorized access to the project site occurs.

g.      Fire Hazards.  Seller shall store flammable materials, solvents, paint, fuels, and oily rags using means, methods and containers meeting OSHA and State regulations.

h.      Property Lines and Site Access.  Buyer will provide clear and visible physical markers of the site property lines and shall ensure Seller has legal and easy access to the project site for the duration of the project.

i.      Underground, Overhead and Other Utilities.  Buyer shall assume all responsibility for underground utilities.  Buyer agrees to provide clear markings for the location of underground utilities as necessary prior to arrival of Buyer on site  at Seller's request, Buyer shall provide written documentation identifying the location of underground utilities in the areas of installation.

j.      Except as specifically amended or modified hereby, the Original Agreement and the Contract Documents shall remain in full force and effect.

k.      To the extent that any provision in the Original Agreement and/or the Contract Documents is inconsistent with the provisions herein, this Amendment shall govern.

l.      The parties have participated jointly in the negotiation and drafting of this Amendment.  In the event an ambiguity or question of intent or interpretation arises, this Amendment shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Amendment.

m.      This Amendment, together with the Original Agreement and other Contract Documents, contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings, oral and written, relative to said subject matter.  The parties each acknowledge that neither has relied upon any representations, warranties, agreements, arrangements or understandings other than as expressly contained herein.

n.      This Amendment and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon each of the parties and their respective successors and permitted assigns.

o.      No change in, amendment to, waiver or termination of this Amendment, or any part hereof, shall be valid unless in writing and signed by all parties, and no waiver or any of the provisions or conditions of this Amendment or any of the

7

rights of a party hereto shall be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given or consented thereto.  No waiver by either party of any condition of this Amendment or breach by the other party of any of its obligations or representations hereunder or thereunder shall be deemed to be a waiver of any other condition or subsequent or prior breach of the same or any other obligation or representation by the other party, nor shall any forbearance by the first party to seek a remedy for any noncompliance or breach by the other party be deemed to be a waiver by the first party of its rights and remedies with respect to such noncompliance or breach.

        p.      Each of the following Exhibits is attached hereto and incorporated herein by this reference:

| EXHIBIT | DESCRIPTION |
| --- | --- |
| A | Seller's proposal dated January 18, 2015 |
| B | Construction Documents |
| C | Construction Schedule |
| D | Milestone Dates |

        q.      This Amendment shall be governed by and enforced in accordance with Colorado law, without reference to conflicts of laws principles.

        r.      This Amendment may be executed in one or more counterparts, all of which together shall constitute one original document.

BUYER:
THE VAIL CORPORATION
a Colorado corporation d/b/a Vail Associates, Inc.

By: _____
Name: _____
Title: _____

SELLER:
BONSAI DESIGN, LLC, a Colorado limited
liability company

By: _____
Name: JOHN WALKER
Title: PRESIDENT

8

8 of 75

EXHIBIT A

Proposal dated January 18, 2015 attached hereto

9



201 South Avenue
Grand Junction, CO 81501
Office - 970-255-7393 // Fax - 970-255-6741
www.bonsai-design.com

# INSTALLATION SERVICES PROPOSAL

**Project:** VAIL GAME CREEK ZIP LINE TOUR

AERIAL ADVENTURE COURSE *Model Name*: Sky-Rider™ Zip Line Tour

DATE: January 18, 2015

This proposal for services is to be rendered within, and under the terms of, Design Build Agreement Contract #2V058-005 between Bonsai Design, LLC. ("BONSAI") and The Vail Corporation ("CLIENT").

## 1) SCOPE OF INSTALLATION SERVICES

Services provided under this proposal:

### COURSE INSTALLATION
- 7 zip line tour with one sky bridge, 2 wooden and 7 steel operations towers, 2 Entry Sky-Stairs, and 2 Rappel Stations
- Course to be installed as specified in Construction Drawings as delivered and dated 2-__-2015
- 3rd party inspections for ground compaction, concrete, etc.

### SAFETY EQUIPMENT
- 108 Participant Equipment Sets
- 22 Guide equipment Sets
- 9 Emergency Take-Down Bags

### TRAINING
- **Guide Training—Lead Guide Track (2 classes of candidates):** 40 hours of formal instruction for a group of up to 10 candidates, 10 hours of assessment including a written exam and on-course skills demonstrations. This program will be conducted by 2 instructors.
- **Program Start-Up Oversight and Operations Consulting:** 40 hours on site spread over the first 7 days of program operation, including supervision and coaching of guide staff and operations consulting with program managers and supervisors.
- **Guide Assessment and Certification:** Written evaluations and recommended development plans for each trainee. Certificates of qualification for those guides whose performance at the end of training meets the required standards. Only trainees whom BONSAI's trainers have observed directly will be eligible for certification.

### DOCUMENTATION
- Commissioning Binder which includes all necessary documents to meet ACCT and ASTM Standards for Installation and Commissioning
- Acceptance Inspection
- Sky-Rider Operations Manual which includes:
  - Operational Protocols
  - Restrictions and limitations of course operations
  - Final Course Layout diagram showing the position of each course element

▲ PRODUCT DEVELOPMENT ▲ DESIGN ▲ INSTALLATION ▲ TRAINING ▲ INSPECTION ▲ MAINTENANCE ▲



*Bonsai Design Proposal / Game Creek Zip Line Tour — Page 2*

- o   Written Instructions for Routine Maintenance and Inspections

## FOOD & LODGING

- BONSAI will provide for all travel and food/meals associated with services
- The parties will work together to coordinate lodging for BONSAI staff during the project
- At all times during services, CLIENT may provide lodging as it so chooses
- CLIENT will directly reimburse BONSAI for BONSAI's lodging costs for the project
- BONSAI agrees to a not-to-exceed number for lodging costs of ███
- For all lodging that CLIENT provides, BONSAI will discount its billing in order to provide a savings on the total cost of lodging
- In the event that CLIENT provides lodging the following criteria shall be met:
  - o   Reasonably furnished accommodations with beds, couches, tables etc.
  - o   At least one kitchen with accessories sufficient to allow all tenants to cook all meals
  - o   Wireless internet service with bandwidth for 4 users at a time
  - o   Individual and private bedrooms to accommodate one-person occupancy for 5 rooms; and two-person occupancy for 4 additional rooms
  - o   Be in close proximity to the build site
  - o   The provided lodging must be dedicated solely to BUILDER's staff for the duration of the project and must not be exchanged for other lodging during the project

## 2)   EXCLUSIONS AND CLIENT RESPONSIBILITIES

Our services will require the support and involvement from CLIENT.  BONSAI will request meetings in order to effectively make decisions during ongoing installation.  CLIENT will ensure that its staff are involved to the degree necessary to ensure decisions are made to allow forward progress of design.

## CLIENT REQUIREMENTS

Prior to commencement of the project, CLIENT will provide the following:

- a)   Easy and continuous access to the project site
- b)   Physical staking that shows property lines if necessary
- c)   Access to each tower station that meets the following criteria
  - 8 – 10 feet wide
  - Passable by general construction and excavation equipment (back-hoes, skid-steers, and UTV-type and ATV-type vehicles)
- d)   Tree clearing at each station, including stump removal where necessary

During the project installation, CLIENT will provide the following:

- a)   Corridor tree clearing as necessary to facilitate efficient installation of zip line cables, and to ensure zip line clearance envelope requirements
- b)   Trail installation as necessary
- c)   Lodging where CLIENT so chooses

## EXCLUSIONS

The following items will not be included in the scope of BONSAI's services

- Installation that is not included in the Course such as: Transport roads, hiking trails to, from or between the Course Elements
- Installed Access and tree clearing of Course Tower Stations will be the responsibility of CLIENT





*Bonsai Design Proposal / Game Creek Zip Line Tour — Page 3*

- Our installation services are for the COURSE and not for the associated site infrastructure. Installation of associative buildings, restrooms, roadways, security and access to and from the course, are all the responsibility of the CLIENT. BONSAI will provide general consultation in these areas but will provide no direct services for these essential items.
- The installation of course ground trails, other than a conceptual layout of the trails is not included in the scope of these services. It is our recommendation that course trails be installed to a specific standard.

## 3) FIELD-FIT PROCESS

Our installation will adhere to current design and engineered plans. In some cases, Field-Fit design is necessary to achieve the total scope of course installation services while ensuring that the course will operate correctly. With Field-Fit, components of the course may need to be adjusted during installation, including re-location or other modifications of components. In this case, as long as the adjustments are minor and do not materially affect the course design, BONSAI will make these adjustments in order to accomplish the objective of installation of an effectively operating course. BONSAI will include the correct adjustments in the final "As-Built" documents as provided after course completion. In the case of significant material adjustments or changes, BONSAI must receive formal approval from CLIENT prior to making such changes or adjustments.

## 4) SCHEDULE

BONSAI and CLIENT will collaborate regularly on the sequence of work, and will strategize the collective efforts based upon the weather. The following milestones serve as an initial target for dates that the parties will work diligently towards achieving.

BONSAI will deliver services along the following schedule:

- Commence Fabrication Process with Fabrication Subs: 4 / 17 / 15
- Complete Fabrication Process: 6 / 15 / 15
- Mobilization: 6 / 1 / 15
- Commence Installation on project site no later than: 6 / 15 / 15
- Course Commissioning no later than: 10 / 28 / 15
- De-Mobilization: 10 / 30 /15

CLIENT will provide its requirements along the following schedule:

- Execute Change Order and to receive BONSAI invoice: 2 / 13 / 15
- Complete access and tree clearing for first 3 stations (stations TBD by BONSAI): 6 / 8 / 15
- Complete access and tree clearing for remaining stations: 6 / 15 / 15
- Complete corridor tree clearing for first 3 runs: 6 / 15 / 15
- Complete corridor tree clearing for remaining zip line runs: 7 / 27 / 15

## 5) FEES AND PAYMENTS

CLIENT will pay BONSAI the sum of ▮▮▮▮▮ for the proposed services.

This total fee is broken down as follows:

- ▮▮▮▮ - ADMINISTRATION AND LABOR
- ▮▮▮▮ - MATERIALS





- ██ – SUB CONTRACTORS
- ██ – SAFETY EQUIPMENT
- ██ DOCUMENTATION
- ██ TRAINING, START-UP
- ██ MOBILIZATION, TRAVEL
- ██ MEALS, FOOD
- ██ LODGING

BONSAI will communicate progress of PROJECT to CLIENT.  Progress payments will be based upon percentage of project completion, as verifiable by completion of specific elements in the scope of the provided services.  CLIENT and BONSAI agree that should difficulties arise for completion of the specific requirements for each progress payment, requisite and equal amount of completion can be attained in other areas of the project in order to satisfy total intended percentage completion of each .

CLIENT will deliver progress payments to BONSAI according to the schedule below:

(1) **First Installment:** ██
Due 30 days after execution of the Change Order associated with this proposal
Projected date:  March 13, 2015

(2) **Second Installment:** ██
Due upon completion of items below, or requisite amount of work as agreed by BONSAI and CLIENT; Projected date: May 12, 2015
- Steel Tower Fabrication – 80%
- Wood Tower Frame Material Acquisition – 100%
- Wire Rope and Hardware Acquisition – 80%

(3) **Third Installment:** ██
Due upon completion of items below, or requisite amount of work as agreed by BONSAI and CLIENT; Projected date: August 10, 2015
- All Fabrication complete and Materials Ordered – 100%
- Anchor Installation – 100%
- Steel Tower Installation – 25%
- Wood Tower Installation – 75%

(4) **Fourth Installment:** ██
Due upon completion of items below, or requisite amount of work as agreed by BONSAI and CLIENT; Projected date: September 28, 2015
- Wood Tower Installation – 100%
- Steel Tower Installation – 75%
- Zip Line Installation – 50%
- Belay and Brake Systems, Bridges, Elements – 50%

(5) **Final Construction Installment:** ██
Due upon completion of Course Commissioning; Projected date: October 30, 2015

(6) **Training Installment:** ██
Due upon completion of Training; Projected date: TBD



13 of 75

## 6) MISCELLANEOUS PROVISIONS

a) **Work Standards and Project .** BONSAI recognizes that certain local and CLIENT rules and regulations will govern its activities on the project site. BONSAI agrees to attend all pre-construction and regular weekly meetings and will ensure that during the provision of its services BONSAI meets all applicable regulatory requirements such as OSHA and work-at-height, as well as CLIENT's on-site rules and regulations.

b) **Project Control and Commissioning.** CLIENT hereby acknowledges that the control and operation of the course involves inherent risk of physical injury to participants and staff. In order to mitigate foreseeable risk and establish controlling entities, CLIENT and BONSAI agree to follow BONSAI's commissioning process and to follow the term(s) of the Design Build Agreement that relate to this provision.

c) **Delivery of Construction Materials.** BONSAI shall provide delivery of its materials directly to the tower station and other on-mountain staging locations. CLIENT will provide at least two strategic staging areas as will be required for BONSAI to stage its materials. BONSAI will specify its requirements and coordinate with CLIENT to ensure proper staging is available.

d) **Construction Facilities.** CLIENT shall provide the following on site facilities to BONSAI:
   a. Adequate on-mountain staging areas for the project
   b. Office space at the Eagle's Nest area if possible
   c. Access to any available on-mountain internet

e) **Electricity and Fuel.** BONSAI will provide its own generators for installation work out on course. CLIENT may provide BONSAI access to its on-mountain fuel reserves if it so chooses, and in the case of these provisions, BONSAI will track its fuel use and will reimburse CLIENT for all fuel used.

f) **Security and Storage.** BONSAI will provide its own secure storage for tools and equipment for the duration of project. CLIENT will ensure that the total project site is reasonably secure from theft and vandalism and ensure no unauthorized access to the project site occurs.

g) **Fire Hazards.** BONSAI shall store flammable materials, solvents, paint, fuels, and oily rags using means, methods and containers meeting OSHA and State regulations.

h) **Property Lines and Site Access.** CLIENT shall provide clear and visible physical markers of the site property lines and shall ensure BONSAI has legal and easy access to the project site for the duration of the project.

i) **Underground, Overhead, and Other Utilities.** CLIENT shall assume all responsibility for underground utilities. CLIENT agrees to provide clear markings for the location of underground utilities as necessary prior to arrival of BONSAI on site. At BONSAI'S request, CLIENT shall also provide written documentation identifying the location of underground utilities in the areas of installation.

