## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-01946-WJM-MEH

**LISA COWLES**, a citizen of Wisconsin,

Plaintiff,

v.

**BONSAI DESIGN LLC**, a Colorado limited liability
company with its principal place of business in Colorado
and with three members, who citizens of Colorado and/or
citizens of North Carolina;
**VAIL RESORTS, INC.**, a Delaware corporation with
its principal place of business in Colorado;
**THE VAIL CORPORATION**, a Colorado corporation
with its principal place of business in Colorado; and
**VAIL RESORTS MANAGEMENT COMPANY**, a
Colorado corporation with its principal place of business in
Colorado,

Defendants.

## THIRD AMENDED COMPLAINT FOR DAMAGES

COMES NOW the Plaintiff, Lisa Cowles, by and through her attorneys, and as her Third

Amended Complaint against the Defendants and each of them, states and alleges as follows:

## INTRODUCTION

1.     This is a product liability action to recover damages suffered by the Plaintiff, Lisa

Cowles, resulting from a zip-lining accident that occurred on or about July 7, 2017 in Vail,

Colorado. On that date, Plaintiff, Lisa Cowles, suffered serious injuries including but not limited

to traumatic knee fractures and a traumatic brain injury as a result of the unreasonably dangerous

and defective design, manufacture, installation, maintenance, modification, and/or operation of the

"Game Creek" zip-line course in Vail, Colorado. The zip-line course and fixtures, equipment, and components in use on that course on were designed, tested, engineered, manufactured, built, constructed, installed, inspected, maintained, prepared, marketed, owned, and/or operated by one or more of the Defendants. Plaintiff, Lisa Cowles, has experienced and continues to experience to date significant pain and suffering, physical disfigurement, and permanent physical impairment as a result of her injuries caused by the Defendants' dangerously defective products and otherwise negligent and unlawful conduct.

## PARTIES

2.      Plaintiff, Lisa Cowles, is a citizen and resident of the State of Wisconsin.

3.      Defendant Bonsai Design LLC is a Colorado limited liability company or business entity with its principal place of business in Colorado, and is engaged in the business of designing, testing, engineering, manufacturing, constructing, installing, inspecting, preparing, maintaining, marketing, selling, and/or operating zip-line courses and zip-line course components and equipment across the United States including in Colorado.

4.      At all relevant times, the members of Defendant Bonsai Design LLC were Thaddeus Shrader, Sarah Shrader, and John Walker.

5.      At all relevant times, all members of Defendant Bonsai Design LLC were citizens and residents of the State of Colorado and/or the State of North Carolina and were domiciled in the State of Colorado and/or the State of North Carolina.

6.      Specifically, at all relevant times, Thaddeus Shrader was domiciled in Grand Junction, Colorado; Sarah Shrader was domiciled in Grand Junction, Colorado and/or Biltmore Lake, North Carolina; and John Walker was domiciled in Ridgway, Colorado.

7.      Defendant Bonsai Design LLC may hereinafter be referred to as "Bonsai" or "Bonsai Design."

8.      Defendant Vail Resorts, Inc., is a Delaware corporation with its principal place of business in Colorado, and is engaged in the business of designing, testing, engineering, manufacturing, constructing, installing, inspecting, preparing, maintaining, marketing, owning, and/or operating outdoor recreational facilities across the United States including the Game Creek zip-line course in Vail, Colorado.

9.      Defendant The Vail Corporation is a Colorado corporation with its principal place of business in Colorado, and is engaged in the business of designing, testing, engineering, manufacturing, constructing, installing, inspecting, preparing, maintaining, marketing, owning, and/or operating outdoor recreational facilities across the United States including the Game Creek zip-line course.

10.     Defendant Vail Resorts Management Company is a Colorado corporation with its principal place of business in Colorado, and is engaged in the business of designing, testing, engineering, manufacturing, constructing, installing, inspecting, preparing, maintaining, marketing, owning, and/or operating recreational facilities across the United States including the Game Creek zip-line course.

11.     Defendants Vail Resorts, Inc., The Vail Corporation, and Vail Resorts Management Company, Inc. may hereinafter be collectively referred to as "Vail" or "the Vail Defendants."

## JURISDICTION AND VENUE

12.     This Court has personal jurisdiction over the Defendants because Defendants have transacted and continue to transact business in Colorado and/or business that is purposefully

directed at Colorado and at consumers in Colorado, and because Defendants have committed the tortious acts and omissions complained of herein in the State of Colorado.

13.    Plaintiff claims damages in excess of $75,000 in this action, excluding costs and interest.

14.    This Court is vested with jurisdiction of this action by the diversity statute, 28 U.S.C. § 1332.

15.    This Court is vested with venue of this accident because a substantial portion of the events or omissions giving rise to the claim occurred in this judicial district, making venue appropriate pursuant to 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

### Basic Principles of Zip-Line Design and Operation

16.    "Zip-lines" in one form or another have been used by humans for centuries.

17.    A simple zip-line consists of a pulley suspended on a cable, usually made of stainless steel, that is mounted between two points on a slope.

18.    The zip-line uses gravity to transport cargo or persons down the slope from the top point to the bottom point of the zip-line.

19.    Cargo or persons are attached (or hold onto) the freely moving pulley, which then engages gravity to assist its speed of movement down the slope.

20.    The basic design of zip-lines, and comparable ropeways or aerial cables, has been used as a method of transportation in mountainous areas for centuries.

21.    The use of gravity to assist in the transportation of cargo or persons along the cable is the defining feature of the zip-line and distinguishes zip-lines from other forms of ropeways or

aerial cables.

## Rapid Growth of the Commercial Zip-Line Industry

22.     In recent years, zip-lines have been adapted for commercial use in tourism and outdoor recreation in the United States and elsewhere.

23.     Zip-lines built for recreational purposes range from small-scale, low to ground zip-lines in playgrounds to large-scale elevated zip-line courses built high across forested or mountainous terrain.

24.     Commercial zip-line "tours" are now a popular vacation activity, with zip-line courses found at upscale resorts and outdoor adventure camps where they may be included as an element on a larger challenge such as a hike or ropes course.

25.     Commercial zip-lining has seen rapid expansion in recent years with the growth of zip-lining as a popular tourism activity.

26.     In 2000, for example, there were only ten commercial zip-lines operating in the United States.

27.     By 2016, there were more than four hundred commercial zip-lines operating in the United States.

28.     Today, commercial operators like Vail may charge hundreds of dollars for a single "tour" down a large-scale zip-line course.

29.     The growth of commercial zip-lining has fueled explosive growth in a cottage industry of companies marketing zip-line design, manufacturing, construction, installation, and training services, as well as design, engineering, and manufacturing of zip-line equipment, fixtures, and components.

30.     These companies, like Defendant Bonsai Design, have achieved enormous financial

5

success in marketing their products and services to major resort operators like Vail, securing lucrative contracts to design and build complex, large-scale zip-line courses including course infrastructure, myriad components and equipment, harnesses for guests, and training programs for zip-line course "guides."

31.    The commercial success of zip-line manufacturers like Defendant Bonsai Design has been supported by keeping in-house the design, engineering, and manufacturing of customized zip-line course equipment, fixtures, and components such as trolleys, braking systems, cable clamps, pulling hardware, tower systems, and anchoring attachments.

**Large-Scale Commercial Zip-Line Courses and "Canopy Tours"**

32.    The union of major resort operators like Vail and commercial zip-line manufacturers like Bonsai has fueled the development of larger and larger scale zip-lining courses intended to generate larger and larger profits for the industry.

33.    For example, "canopy tours," as known in the industry, typically provide a route through a forested or mountainous landscape by making primary use of multiple zip-lines and aerial bridges between platforms built into trees or atop fabricated towers.

34.    These large-scale zip-line courses typically involve multiple zip-lines stretching hundreds or even thousands of feet between tower platforms ranging from tens to hundreds of feet above the ground.

35.    The larger scale of such courses typically means that riders are transported at speeds considerably faster than those found on small recreational zip-lines and smaller zip-line courses.

36.    As a servicer of major resort operators engaged in developing large-scale zip-line courses to increase tourism revenues in the summer months, Defendant Bonsai has marketed its "flagship" canopy tours featuring multiple zip-lines, adventure elements, and tree- or tower-based

6

platforms capable of "through-putting" in excess of two hundred guests daily.

37.     Similarly, Defendant Bonsai has marketed "Sky Rider" and "Big Zip" course designs incorporating multiple zip-lines stretching up to 5,000 feet in length with other adventure elements such as "sky-bridges," rappels, and swings capable of "through-putting" as many as four hundred paying guests per day.

38.     Bonsai has specifically marketed such large-scale course designs to resort operators like Vail as featuring "quick turn-around times, or 'cycles'" that allow course operators to achieve "high-throughput" [sic] of guests through the course, so as to "elevate [operators'] business to new heights."

39.     In other words, Bonsai has marketed its designs to major resort operators like Vail by highlighting how a large-scale course can allow the course operator to charge hundreds of guests hundreds of dollars each for zip-line tours in a single day, thus generating tens of thousands of dollars in daily revenues during the off-season and summer months.

40.     Canopy tours have developed as a popular form of recreational zip-lining, including at upscale resorts like Vail, alternately being marketed to consumers and tourists as a form of ecotourism and as an adventure sport.

41.     At all relevant times, Vail characterized the Game Creek course as a "canopy tour" in its licensing submissions to the State of Colorado.

### Development of Custom Zip-Lining Equipment for Large-Scale Commercial Zip-Lines

42.     The rapid development of large-scale zip-line courses and canopy tours has spurred equally rapid development of custom zip-line equipment specifically designed to facilitate operation of these large-scale commercial attractions.

43.     Large-scale canopy tours such as the Game Creek zip-line course at Vail, for

example, typically make use of a type of pulley with a grooved wheel known as a sheave, with the pulley turning as it travels along, reducing friction and enabling greater speed than would otherwise be possible.

44.     Canopy tours like Game Creek also make use of a zip-line "trolley," which is the frame or assembly housing the pulley that runs along the zip-line cable.

45.     On a canopy tour like Game Creek, the trolley is typically attached to a harness or seat that attaches to the pulley by a pivoting link or carabiner which secures the load, allowing the rider to travel down the zip-line while suspended from the trolley.

46.     Zip-line manufacturers like Bonsai have developed customized sheaves, trolleys, harnesses, and related zip-lining gear specifically for use on large-scale zip-line courses featuring longer zip-lines and faster rider speeds, like the Game Creek zip-line course.

47.     Zip-line manufacturers like Bonsai have also developed various braking systems and applications specifically for use on such large-scale zip-line courses featuring longer zip-lines and faster rider speeds.

48.     A zip-line braking system is an arrangement of primary and secondary or emergency brakes that are designed to function together.

49.     At all relevant times, Bonsai designed various custom braking systems that consisted of primary and secondary or emergency braking components that it designed to function together with other braking system components.

50.     At all relevant times, for example, Bonsai marketed various custom designed and manufactured braking system components including, for example, its "All-Stop terminus block," "Butterfly brake shuttle," single and twin-line "EAD system[s],"[1] "Sky-Rider brake bobbin," and

---

[1] "EAD" stands for "emergency arrest device."

"Zip E-Brake."

51.   At all relevant times, Bonsai's marketing materials for its canopy tour, "Sky Rider," and "Big Zip" course designs similarly touted its customized "mechanized brake systems," "redundant braking systems," "redundant failsafe back-ups for braking systems," optional hand-brakes, and "the most technologically advanced braking systems in the industry."

52.   At all relevant times, Bonsai marketed these and other braking system components as providing redundancy in braking systems integrated into its course designs so as "eliminate" the possibility of "patron-to-structure contact," i.e., riders crashing at high speeds into towers, platforms, equipment, fixtures, and other obstacles on a zip-line course.

53.   At all relevant times, Bonsai had a practice of designing, engineering, and manufacturing custom braking systems and braking system equipment and components and then integrating those systems, equipment, and components into its large-scale course designs for commercial clients like Vail.

54.   At all relevant times, Bonsai's practice in this regard at times involved selecting and utilizing certain component parts of third-party entities, including but not limited to primary brake components, brake system ropes, and/or riggings, and designing, combining, assembling, installing, and integrating those components into a single braking system design, including by designing, manufacturing, and fabricating other system components specifically to work with Bonsai components and third-party components and assembling and installing both Bonsai components and third-party components together into a single braking system design.

55.   At all relevant times, Bonsai's design, manufacture, and installation of custom braking systems entailed selecting, integrating, and assembling components in the design and manufacture of its overall braking systems, selecting and/or fabricating other components, fixtures,

9

and equipment to work with those third-party components, and preparing all of the components, fixtures, and equipment for use in its braking systems, including but not limited to by installing, testing, modifying, and repairing the system and all of its constituent components, which were specifically design to fit and work together as a single integrated braking system.

56.    The single integrated braking system used at Game Creek was designed, marketed, manufactured, assembled, installed, and sold as a final product by Bonsai to Vail and others.

**Safety Risks and Hazards With Commercial Zip-Lines**

57.    The explosive growth of the commercial zip-line industry has occurred in the absence of consistent or coordinated regulatory oversight.

58.    The relative lack of regulatory oversight combined with the increasing scale of zip-line course design has created new and enhanced safety risks and hazards attendant to recreational zip-lining, especially on large-scale courses and canopy tours like Game Creek, including risks and hazards associated with the construction of tall zip-lines and zip-line tower platforms, high-speed zip-lines, zip-lines of thousands of feet in length, and zip-lines integrating customized braking systems and braking system equipment and components such as the systems, equipment, and components designed, assembled, fabricated, produced, constructed, installed, and otherwise prepared by the Defendants.

59.    As the commercial zip-line industry has grown in the United States, so has the rate of serious injuries and deaths on commercial zip-line courses. According to a 2015 study from the American Journal of Emergency Medicine, emergency room visits for zip-line injuries in the United States increased from a few hundred in 1997 to more than 3,600 in 2012, with the total number of injuries estimated at 16,850. Another study found that almost twelve percent of injuries involved serious fractures or other injuries requiring hospitalization and that seven percent

involved traumatic brain injuries.

60.    Accidents and injuries on commercial zip-line courses have been widely reported in the news media and well-known in the industry for years. Dozens of zip-lining injuries and deaths have been reported in the news media in recent years including, by way of example only, fatal accidents on a Delaware zip-line course in August, 2016; on a zip-line course at a Utah ski resort in May, 2016; on another Utah course in July, 2015; on a North Carolina course in June, 2015; on Hawaii zip-line course in May, 2014; and at another Hawaii zip-line course in September, 2011.

61.    At all relevant times, Vail and Bonsai knew that risks of serious injury and death were associated with zip-lining.

62.    At all relevant times, Vail and Bonsai knew that the risks of serious injury and death associated with zip-lining increased exponentially on large-scale courses and canopy tours like the Game Creek course because such courses are designed and built to transport guests between taller towers, on higher and longer zip-lines, and at considerably higher speeds than other types of zip-lines.

63.    At all relevant times, Vail and Bonsai were aware of and knew of the numerous widely reported incidents of serious zip-lining injuries and deaths including multiple widely reported incidents where guests at large-scale recreational courses substantially similar in design and dimension to the Game Creek zip-line course suffered serious injuries or were killed.

64.    Indeed, prior to July 7, 2017, Vail was aware of numerous specific instances where consumers were injured in accidents on its own zip-line courses including the following incidents in which consumers were injured on Vail zip-line courses before Plaintiff Lisa Cowles's accident:

     a.    An incident in which a consumer alleged to have received injuries on a zip-lining course at Vail in August, 2013;

11

b.   Three separate incidents in which consumers alleged to have received injuries on a zip-lining course at Breckenridge in April, 2014;

c.   An incident in which a consumer alleged to have received injuries on a zip-lining course at Breckenridge in June, 2014;

d.   Two separate incidents in which consumers alleged to have received injuries on a zip-lining course at Breckenridge in August, 2014;

e.   An incident in which a consumer alleged to have received injuries on a zip-lining course at Vail in August, 2014;

f.   An incident in which a consumer alleged to have received injuries on a zip-lining course at Park City in July, 2016;

g.   An incident in which a consumer alleged to have received injuries on a zip-lining course at Vail in June, 2017, approximately two weeks before Plaintiff Lisa Cowles's accident; and

h.   An incident in which a consumer alleged to have received injuries on a zip-lining course at Park City in July, 2017, just two days before Plaintiff Lisa Cowles's accident.

65.   The eleven (11) incidents set forth in the preceding allegation resulted in formal claims or lawsuits against Vail.

66.   Upon information and belief, Vail paid financial settlements to one or more of the consumers injured in these incidents and/or to the family members or heirs of such consumers.

67.   Prior to July 7, 2017, Bonsai was aware of one or more of these incidents, including a June 24, 2017 incident where a braking system on the Game Creek Zip-Line Course suddenly failed and malfunctioned, resulting in a guest injury.

68.    Upon information and belief, the June 24, 2017 incident resulted in a legal claim against Vail and Bonsai, which was resolved by a financial settlement paid on behalf of both Vail and Bonsai.

69.    There may be and likely are additional zip-line accidents that occurred on Vail zip-line courses and on zip-line courses designed and/or built by Bonsai or built utilizing Bonsai-designed equipment and components, prior to Plaintiff Lisa Cowles's accident.

70.    The number of zip-line accidents that occurred before Lisa Cowles's accident put Vail and Bonsai on further notice that their zip-line courses were dangerous and that extreme safety precautions were required to ensure the safety of guests like Plaintiff.

71.    At all relevant times, Vail and Bonsai knew that strict adherence to proper design, manufacture, assembly, installation, inspection, maintenance, and operation of zip-lining courses and zip-line course fixtures, equipment, and components was absolutely essential to preventing serious injuries and deaths to zip-line users, including guests on the large-scale recreational zip-lining courses they were in the business of designing, building, and operating.

72.    At all relevant times, Vail and Bonsai knew that failing to strictly adhere to proper design, manufacture, assembly, installation, inspection, maintenance, and operation of zip-lining courses and zip-line course fixtures, equipment, and components would create a substantial and unreasonable risk of serious injury and death for users of such zip-lining courses and zip-line course fixtures, equipment, and components, especially guests on the large-scale recreational zip-lining courses they were in the business of designing, building, and operating, given the comparatively greater heights, speeds, and dimensions of such courses and the comparatively greater forces and stresses placed on the fixtures, equipment, and components used on such courses.

13

**Development and Construction of the Game Creek Zip-Line Course**

73.    On or about September 19, 2012, Vail and Bonsai entered into a "Design and Build Agreement" for construction of the Game Creek zip-line course in the Game Creek bowl on the back side of Vail Mountain.

74.    Under the Vail-Bonsai agreement, Vail engaged Bonsai to "design, engineer, and potentially sell, deliver, and install … the service and equipment described" in the agreement, including designing and building the Game Creek zip-line course; manufacturing, fabricating, selecting, assembling, preparing, and installing the zip-lines and zip-line fixtures, equipment, and components on the course (including but not limited to pulleys, sheaves, trolleys, harnesses, cables, ropes, braking systems, and braking system equipment and components); providing operations manuals and protocols for the inspection, maintenance, and operation of the course and all course equipment; and providing training and "certification" materials to Vail and its employees and operational support including ongoing periodic maintenance and inspection of the course and the zip-lines and the zip-line fixtures, equipment, and components including but not limited to braking systems and braking system equipment and components.

75.    Vail's Game Creek project was part of its push to grow its ski resort operations by expanding off-season recreational opportunities including zip-lines, adventure courses, and alpine coasters at its ski resort properties across the United States.

76.    Vail marketed the Game Creek project as the "crown jewel" of its Epic Discovery development, a mountaintop attraction which included adventure courses and alpine coasters on Vail Mountain and was intended to generate more tourism and revenue on Vail's ski property in the off-season months.

77.    The Vail-Bonsai agreement was part of Bonsai's concerted effort to expand into

large-scale zip-line course design and construction at Vail Resorts properties across the United States including Vail, Breckenridge, Heavenly ski area in California and Nevada, and Snowbasin resort in Utah.

78.     Landing the contract to design and build Vail's Game Creek course was a huge commercial opportunity for Bonsai.

79.     Under the Vail-Bonsai agreement, Vail retained authority to provide specifications to Bonsai and to request changes to Bonsai's plans for the design, construction, assembly, preparation, and installation of the zip-line course, zip-lines, fixtures, equipment, and components.

80.     Under the Vail-Bonsai agreement, Vail also retained authority to approve and ratify Bonsai's decisions on these issues.

81.     Following execution of the Vail-Bonsai agreement, Vail submitted a series of Form of Change Orders instructing Bonsai to make certain changes to its course designs and to undertake certain design, engineering, and construction tasks required by those changes.

82.     For example, Vail submitted a Form of Change Order to Bonsai on or about March 20, 2014, which required Bonsai to revise the alignment of its Game Creek course design and to modify its tower design "based on request from [Vail] to modify launch/landing location."

83.     Vail's instructions in this regard entailed Bonsai making changes to the location, design, and construction of the subject zip-line where Plaintiff was injured on July 7, 2017.

84.     Bonsai subsequently integrated Vail's changes into its modified course designs, which in turn required redesigns of the zip-lines and course fixtures, equipment, and components, including but not limited to the subject zip-line, and for which Bonsai received additional compensation from Vail above and beyond the initial contract price.

85.     Supplemental "Design Phase" documents prepared and submitted to Vail by Bonsai

emphasized the "on-site collaboration between Bonsai and [Vail]" throughout the design phase of the Game Creek zip-line course, including as it relates to the design of the subject zip-line where Plaintiff was injured on July 7, 2017.

86.   Vail ultimately instructed Bonsai to design and build a large-scale, canopy tour-style zip-line course traveling across and down the Game Creek bowl, featuring an array of zip-lines and aerial bridges suspended among multiple landing platforms constructed atop elevated towers.

87.   Vail and Bonsai subsequently entered into an "Addendum to Design and Build Agreement" on or about February 23, 2015, which governed the remaining services performed by Bonsai in designing and constructing the Game Creek course and in designing, fabricating, selecting, assembling, and installing all zip-lines on the course, and all zip-line fixtures, equipment, and components including braking systems and braking system components, according to Vail's "collaboration" with Bonsai during the design phase and according to its specific instructions to Bonsai with respect to Vail's modifications to Bonsai's course and zip-line designs.

88.   The re-designed Game Creek course, as configured through the collaboration between Vail and Bonsai, featured seven zip-lines, spanning a total of approximately 10,000 feet, including one zip-line more than a half mile in length, another that propelled guests at speeds of fifty to sixty miles per hour, and another that carried guests approximately 300 feet above the ground.

89.   Upon information and belief, the total value of the Game Creek project to Bonsai following the redesigns commissioned by Vail was substantial, likely extending well into seven or eight figures.

90.   Upon information and belief, the Game Creek project ultimately became the largest or one of the largest zip-line course design and construction project(s) ever undertaken by Bonsai.

91.     Upon information and belief, the Vail-Bonsai Agreement was the largest or one of the largest commercial contract(s) and/or a part of one of the largest commercial contract(s) ever secured by Bonsai.

92.     Bonsai completed construction work on the Game Creek zip-line course in the fall of 2015.

93.     Vail obtained a license from the State of Colorado to commercially operate the Game Creek zip-line course in the fall of 2015.

94.     Bonsai, which is listed in State documents as the "manufacturer" of the Game Creek zip-line course, is also listed in those documents as having performed the "inspections" and "certifications" of the course that the State of Colorado required as a condition of Vail's receiving and maintaining a license to commercially operate the course.

95.     Bonsai continued to provide periodic maintenance,  inspection, and related services to Vail following licensing of the Game Creek course by the State of Colorado, including maintenance and inspection services related specifically to braking systems on the course and including through the date of the subject accident of July 7, 2017.

96.     Vail opened the Game Creek zip-line course to the public in July, 2016.

97.     Vail subsequently contracted with Bonsai to design and build additional large-scale zip-line courses and canopy tours at Vail's other ski resort properties including Breckenridge, Beaver Creek, Heavenly, Snowbasin, and Jackson Hole, as well as additional zip-lines, adventure courses, ropes courses, and similar attractions at Vail and elsewhere.

**Design and Operation of the Game Creek Zipline Course**

98.     Bonsai designed the Game Creek zip-line course to utilize a cable-and-pulley system common to modern, commercial, and large-scale zip-line courses.

99.   Bonsai's design included a pulley encased inside a trolley that attached to a free-spinning harness or seat in which a guest would be secured.

100.   Bonsai's design called for guests to travel down the zip-line while suspended from the trolley by the harness or seat.

101.   Bonsai's design was for guests to travel down individual zip-lines suspended between elevated platforms constructed on top of towers built by Bonsai around the course.

102.   Guests would travel from a platform at the top end of the zip-line to a platform at the bottom end of the zip-line, utilizing gravity to carry them down the line.

103.   Some towers were designed and built with platforms that secured the bottom end of one zip-line and the top end of another zip-line.

104.   Other towers were designed and built with platforms that secured the top or bottom end of a single zip-line and were then connected to other zip-line towers by rope-bridges, belaying stations, and similar "adventure" features.

**Bonsai's Custom Braking Systems on the Game Creek Zip-Line Course**

105.   Safe operation of Bonsai's zip-line course design required braking systems designed to slow and stop guests coming down a zip-line towards a platform.

106.   Vail's course design changes, which Bonsai incorporated into its course designs and which included, upon information and belief, designs for longer, steeper, and/or faster ziplines than originally planned by Bonsai, increased the need for properly and reliably functioning braking systems and braking system equipment and components at all times in order to protect the safety of guests on the Game Creek course.

107.   Bonsai's Game Creek course design included a custom braking system of its own design.

18

108. Bonsai's custom braking system design included, *inter alia*, a brake bobbin assembly, a "Zip Stop" brake assembly, an "EAD" ("emergency arrest device") assembly, an All Stop assembly, and various cables and ropes connecting these and other components.

109. Bonsai designed its custom braking system to include a "primary" braking system consisting of a brake shuttle/bobbin rigged to a Zip Stop component, and a "secondary" or "emergency" braking system consisting of an EAD.

110. Bonsai designed its custom braking system for the "primary" and "secondary" braking systems to work and function together under normal operating conditions and under sudden or emergent conditions.

111. Bonsai designed its custom braking system for all components of the "primary" and "secondary" braking systems to work and function together under normal operating conditions and under sudden or emergent conditions.

112. Bonsai's braking system design and the design of the individual components were such that the components did not function unless assembled, installed, and used together as components within a custom braking system.

113. For example, Bonsai designed its brake bobbin to work as a component of a "primary" braking system including a Zip Stop braking component manufactured by Bonsai or by a third party, and to have a critical integration with the EAD as well.

114. Likewise, Bonsai designed its EAD to work with the primary braking components to retrieve and pull guests from the landing zone onto the landing platform at the end of the zip-line and to then assist in re-deploying the primary braking components back into the landing zone area of the zip-line after guests had been safely received on the platform and detached from the zip-line.

115.   Bonsai also designed its EAD to work as a secondary or emergency braking system that would safely slow, stop, and arrest the motion of a guest down the zip-line in the event of a failure or malfunction of the primary braking system or components of the system.

116.   Bonsai designed, engineered, tested (or failed to test), manufactured, selected, assembled, prepared, and installed all of the zip-line fixtures, equipment, and components comprising its custom braking system on the Game Creek zip-line course, including all "primary" and "secondary" or "emergency" braking equipment and components.

117.   Bonsai's design did not include hand brakes.

118.   Bonsai's design did not include any braking equipment or components that could be controlled by a guest on the zip-line.

119.   Bonsai's design did not include any equipment or means a guest could use to slow or stop themselves on approach to a landing platform.

120.   Under Bonsai's design, the safety of guests on the Game Creek course depended on properly functioning braking systems, including properly designed, engineered, tested, manufactured, selected, assembled, prepared, and installed braking system fixtures, equipment, and components, to stop their forward motion towards the braking equipment, platform, tower, fixtures, and end of the zip-line cable.

121.   Under Bonsai's design, the safety of guests on the Game Creek course also depended on proper maintenance, use, and operation of its custom braking systems by the course operator and guides because Bonsai's custom design placed all control over the functioning of the braking system and braking system equipment and components with the course operator and guides that accompanied and guided guests down the zip-line course.

**Operational Protocols on the Game Creek Zip-Line Course**

20

122.   Upon information and belief, Vail assumed operational control over the Game Creek zip-line course in the fall of 2015.

123.   Thereafter, Bonsai continued to provide training and operational support to Vail as part of the Game Creek project including but not limited to maintenance and inspection of the course and of all course fixtures, components, and equipment including but not limited to braking systems, fixtures, equipment, and components.

124.   For example, Bonsai provided operational protocols to Vail for to use in operating, inspecting, and maintaining the various zip-lines, fixtures, equipment, and components on the Game Creek course, including but not limited to the braking systems, equipment, and components on the course.

125.   Bonsai similarly provided communications protocols to Vail for use in operating the various zip-lines, fixtures, equipment, and components on the Game Creek course, including but not limited to the braking systems, equipment, and components on the course.

126.   Bonsai advised Vail to develop additional operational and communication protocols to supplement the protocols Bonsai provided to Vail for use in operating the Game Creek zip-line course, including the braking systems, equipment, and components on the course.

127.   Upon information and belief, Bonsai assisted Vail in developing additional operational and communication protocols to supplement the protocols Bonsai provided to Vail for use in operating the Game Creek zip-line course, including the braking systems, equipment, and components on the course.

128.   Upon information and belief, Bonsai assisted Vail in developing training protocols for training Vail employees on the operational and communicational protocols for the Game Creek zip-line course, including with respect to operations and communications and including with

21

respect to operating the braking systems, equipment, and components on the course.

129.   Such protocols included but were not limited to protocols for "sending" guests down the zip-line and for "receiving" guests coming down the zip-line.

130.   Such protocols included but were not limited to protocols for "retrieving" and then redeploying the braking system, equipment, and components to their proper settings and positions on the zip-line after one guest was received from the zip-line and before the next guest was sent down the zip-line.

131.   Such protocols included but were not limited to protocols requiring guides to maintain constant radio communications while on the course and during all course operations including as it relates to sending and receiving zip-line guests and to ensuring the braking system, equipment, and components were timely and properly retrieved, redeployed, and reset.

132.   The design of Bonsai's braking system, equipment, and components required guides on the course to timely and properly retrieve, redeploy, and reset the braking system, equipment, and components on the zip-line after receiving a guest at the bottom platform.

133.   The design of Bonsai's braking system, equipment, and components required guides on the course to timely and properly retrieve, redeploy, and reset the braking system, equipment, and components on the zip-line before another guest was sent down the zip-line from the top platform.

134.   Retrieving, redeploying, and resetting the braking system, equipment, and components entailed, *inter alia*, re-positioning and re-securing the braking system, equipment, and components in their proper positions so that the system, equipment, and components could successfully slow, stop, and arrest the forward motion of a guest coming down the zip-line.

135.   Guides on the platforms at the top and bottom of the zip-line were required to radio

each other to clearly advise when a guest had been received and removed from the line at the bottom platform, when the braking system, equipment, and components had been redeployed and reset on the zip-line, and when it was safe for the guide on the top platform to send the next guest down the zip-line.

136.   Bonsai and/or Vail equipped the braking system equipment and components on each of the Game Creek zip-lines with red or orange "flags" showing that the equipment and components were properly redeployed and reset to successfully slow, stop, and arrest the forward motion of a guest coming down the zip-line.

137.   Pursuant to operational protocols developed by Vail and/or Bonsai, guides on the Game Creek zip-line course were required to instruct guests to look for the red or orange flag showing the braking system was properly set and positioned on their approach towards the equipment and platform.

138.   The design of Bonsai's braking system, equipment, and components was such that the braking system, equipment, and components would fail to properly slow, stop, or arrest the forward motion of a guest if not properly and timely retrieved, redeployed, and reset before a guest was sent down the zip-line.

139.   The design of Bonsai's braking system, equipment, and components was such that the braking system, equipment, and components would allow a guest to crash into the equipment, components, and other fixtures and objects at the bottom end of the line if not properly and timely retrieved, redeployed, and reset before a guest was sent down the zip-line.

140.   Any redundancies built into Bonsai's braking system, equipment, and components would fail to stop, slow, or arrest the forward motion of a guest if any of the braking system equipment and components were not properly and timely redeployed and reset before a guest

entered the landing zone near the bottom of the zip-line.

141.   At all relevant times, Defendants had actual knowledge or, at minimum, should have known, of these and other safety risks and hazards attendant to the design and operation of the custom braking system and braking system equipment and components in use on the Game Creek zip-line course.

**Problems and Modifications to the Braking Systems
on the Game Creek Zip-Line Course
Prior to the Subject Zip-Lining Accident**

142.   After Bonsai completed course construction in the fall of 2015, it was advised of multiple safety issues with the zip-lines and braking systems it had designed and installed on the course.

143.   In 2016, for example, Bonsai became aware that guests were repeatedly stopping short of the zip-line landing zones on the course, particularly on the longer zip-lines.

144.   These incidents had the effect of slowing course operations due to the time required to retrieve the guests and primary braking components stopped short of the landing zone.

145.   In June, 2016, Bonsai modified the custom braking systems on the Game Creek course by adding a "Closed Loop Op-Point Line," a rigging intended to allow course personnel to utilize the "Emergency Arrest System" and components installed on the course as a means of more quickly retrieving guests and primary braking components that stopped short of the landing zone and pulling them into the landing zone.

146.   In 2017, Bonsai became aware of repeated incidents where loops of the critical "redirection cord" component of the primary braking systems were becoming tangled during reset of the braking systems.

147.   At all relevant times, Bonsai knew that the redirection cord was a critical component

24

of its custom braking system design for the Game Creek zip-line course and that its braking systems, including but not limited to primary braking system equipment and components, would not work without a properly functioning redirection cord and would fail to safely slow and stop a guest at the bottom the zip-line if the redirection failed or broke or was severed during use.

148.  At all relevant times, Bonsai knew that tangling of the redirection cord created a substantial risk of the redirection cord failing, breaking, or being severed during use, such that the braking system would malfunction and fail to safely slow and stop a guest at the bottom of the zip-line.

149.  At all relevant times, Bonsai knew that tangling of the redirection cord created a substantial risk of serious injury or death to guests, including from sudden failure or malfunction of braking systems, equipment, and/or components due to damage to the redirection cord.

150.  In or about April, 2017, Vail made additional modifications to the custom braking systems on the Game Creek course, including on the subject zip-line, and including the addition of additional riggings and pulleys.

151.  Vail made these modifications with the knowledge and approval of Bonsai as manufacturer, designer, and installer of the subject zip-line and zip-line braking systems, equipment, and components.

152.  At all relevant times, Bonsai knew that the modifications made by Vail did not adequately address the risks of serious injury or death created by its zip-line and braking system designs, including but not limited to risks of braking system failure associated with tangling of the redirection cord.

153.  At all relevant times, Bonsai knew that the modifications made by Vail in fact increased the risk of the redirection cord failing, breaking, or being severed and the braking

systems malfunctioning and failing during use.

154.   At all relevant times, Bonsai knew that the modifications made by Vail created an additional risk of braking system component failure that could result in the primary braking equipment appearing to have been fully and properly reset when in fact it was not fully and properly reset.

155.   At all relevant times, Bonsai knew that the modifications made by Vail created an additional risk that the secondary or emergency braking system equipment and components in Bonsai's braking system design might fail to safely and independently slow or stop a guest in the event of a primary braking component failure.

156.   At all relevant times, Bonsai knew that the modifications made by Vail created and increased a substantial risk of serious injury or death to guests, including from sudden failure or malfunction of braking systems, equipment, and/or components.

157.   Despite its knowledge in this regard, Bonsai failed to timely and properly advise Vail prior to July 7, 2017 that the modifications made to the braking systems in or about April, 2017 failed to adequately address the risks of serious injury or death created by Bonsai's zip-line and braking system designs, including but not limited to risks of braking system failure associated with tangling of the redirection cord.

158.   Despite its knowledge in this regard, Bonsai failed to timely and properly advise Vail prior to July 7, 2017 that the modifications made to the braking systems in or about April, 2017 increased the risk of the redirection cord failing, breaking, or being severed and the braking systems malfunctioning and failing during use.

159.   Despite its knowledge in this regard, Bonsai failed to timely and properly advise Vail prior to July 7, 2017 that the modifications made to the braking systems in or about April,

26

2017 created additional risks of braking system component failure including the primary braking equipment appearing to have been fully and properly reset when in fact it was not and the secondary or emergency braking equipment failing to safely and independently slow or stop a guest in the event of a primary braking component failure.

160.   Bonsai performed an annual inspection and certification of the Game Creek zip-line course and all zip-lines, zip-line fixtures, equipment, and components on the Game Creek zip-line course on or about May 3, 2017.

161.   Bonsai's inspection was a legal requirement for annual recertification of the Game Creek zip-line course and for issuance of a certificate by the State of Colorado allowing Vail to operate the course.

162.   Upon information and belief, Bonsai's May 3, 2017 inspection report was prepared for submission and/or was actually submitted to the State of Colorado as a condition of Vail's annual recertification and licensing of the course with the State of Colorado.

163.   Bonsai certified as part of its inspection that the Game Creek zip-line course and all zip-lines, zip-line fixtures, equipment, and components on the course were in an operable state and met operational criteria and that any deficiencies identified or noted at the time of the inspection had been corrected.

164.   Bonsai made this certification despite its actual knowledge that the zip-lines and braking systems, equipment, and components on the Game Creek zip-line course, as originally designed and installed and as modified with the knowledge and approval of Bonsai, were defective and unreasonably dangerous in multiple respects and posed a substantial risk of serious injury or death to guests, including but not limited to serious injury or death caused by sudden failure or malfunction of braking systems, equipment, and/or components.

**A Braking System Fails on the Game Creek Zip-Line Course**
**Two Weeks Before Plaintiff's Accident, Resulting in Guest Injury**

165.   On or about June 24, 2017, a braking system failed and malfunctioned on the Game Creek zip-line course, resulting in a guest injury.

166.   The design and components of the braking system that failed in late June, 2017 were the same or substantially similar to the design and components of the braking system that failed during the zip-lining accident that injured Plaintiff on July 7, 2017.

167.   Vail personnel documented at the time (and later) that the primary braking equipment failed and malfunctioned because the redirection cord broke.

168.   At all relevant times prior to July 7, 2017, Bonsai had actual knowledge and notice of this failure mode prior to June 24, 2017.

169.   As noted above, upon information and belief, the June 24, 2017 incident resulted in a legal claim against Vail and Bonsai, which was resolved by a financial settlement paid on behalf of both Vail and Bonsai.

170.   Vail has alleged that it properly and timely notified Bonsai of the June 24, 2017 incident where Bonsai's braking system failed, resulting in a guest being seriously injured.

171.   A risk manager at Vail sent Bonsai's chief executive officer a text message asking for a return phone call about "a zip stop issue" on or about June 30, 2017.

172.   Vail has alleged that its risk manager also called Bonsai's chief executive officer to discuss the June 24, 2017 incident at some point prior to July 7, 2017.

173.   At all relevant times prior to July 7, 2017, Bonsai had actual knowledge and notice of the June 24, 2017 incident where Bonsai's braking system failed, resulting in a guest being seriously injured.

174.   Despite its actual knowledge and notice of multiple defects with the zip-lines and

braking systems, equipment, and components on the Game Creek zip-line course and the propensity of those braking systems, equipment, and components to suddenly fail and malfunction during foreseeable use, and its actual knowledge and notice of the June 24, 2017 incident where a braking system actually did fail and malfunction, resulting in guest injury, Bonsai took no steps to undertake urgently necessary inspection of the course or braking systems, or to perform urgently necessary safety repairs or modifications, or to advise Vail between June 24, 2017 and July 7, 2017 that the braking systems needed to be inspected, modified, and/or repaired so as to avoid subjecting guests to a substantial risk of serious injury or death due to sudden failure and malfunction of the braking systems during use.

175.   Upon information and belief, Vail would have stopped operations on the course to allow for such inspections, modifications, and/or repairs had Bonsai, the designer, manufacturer, and installer of the subject zipline and zipline braking systems, timely and appropriately advised Vail that such steps were necessary to avoid subjecting guests to a substantial risk of serious injury or death due to sudden braking system failures or malfunctions during use.

176.   Alternatively, Bonsai alleges that Vail did not formally report the brake system failure to Bonsai prior to July 7, 2017, did not request that Bonsai perform inspections of the braking systems, and did not otherwise consult Bonsai as to whether additional changes, modifications, or repairs had to be made to the braking systems, equipment, or components on the Game Creek zip-line course in order for the course to be safely operated prior to the subject zip-line accident in which Plaintiff was injured on July 7, 2017.

177.   Vail continued to operate the Game Creek zip-line course following the June 24, 2017 incident where the braking system failed and a guest was injured.

178.   The propensity of the braking systems on the Game Creek zip-line course to

suddenly fail and malfunction and the June 24, 2017 incident where a braking system suddenly failed and malfunctioned, causing a guest injury, were not disclosed to guests, including Plaintiff Lisa Cowles, who used the Game Creek zip-line course after these incidents.

179.   Instead, Vail continued to operate and to charge guests for zip-line tours on the Game Creek zip-line course between the guest injury and the braking system failure in June, 2017 and the subject zip-line accident in which Plaintiff was injured on July 7, 2017, despite knowing that the braking systems on the Game Creek zip-line course were experiencing problems and were subject to sudden failures and malfunctions including failures and malfunctions likely to cause serious injury or death to guests on the course.

180.   Vail continued to operate and to charge guests for zip-line tours on the Game Creek zip-line course during this time period despite knowing that doing so created and subjected its guests to substantial and unreasonable risk of serious injury or death associated with the sudden failure or malfunction of the braking systems, equipment, and/or components in use on the course.

### Plaintiff's Zip-Line Tour on Vail's Game Creek Zip-Line

181.   Plaintiff, Lisa Cowles, and her husband traveled to Vail from their home in Wisconsin for a short summer vacation in early July, 2017.

182.   On July 7, 2017, Mrs. Cowles and her husband paid for a zip-lining tour on the Game Creek zip-line course.

183.   On that date, Mrs. Cowles's and her husband's tour was supposed to begin at 1:30 p.m. but was delayed due to inclement weather in the area and/or due to the large number of guests who had signed up for zip-lining tours.

184.   After the delay, Mrs. Cowles and her husband were told that their tour was a "go."

185.   Mrs. Cowles and her husband were then provided with zip-lining gear including a

harness and helmet and provided short instruction on how to use that gear by Vail employees and guides.

186.   Mrs. Cowles and her husband were then led from the lodge atop Vail Mountain to the first tower on the Game Creek zip-lining course.

187.   Mrs. Cowles and her husband were led to the course as part of a group of six to eight guests.

188.   The group was led by two guides.

189.   At all relevant times, the two guides were employees and/or agents of Vail and were acting within the course and scope of their employment and/or within their actual or apparent authority as agents of the Defendants.

**Vail Employees Instruct and Guide Plaintiff Through the First Three Zip-Lines on the Game Creek Zip-Line Course**

190.   On the platform atop the first tower, Vail's guides provided additional instruction to Mrs. Cowles, her husband, and the rest of the group.

191.   At that time, Vail's guides instructed the group on how to launch down the zip-line from the platform and what to expect as they neared the next platform at the bottom of the zip-line.

192.   At that time, Vail's guides instructed the group to look for a red or orange flag atop the braking system equipment and components as they approached the landing platform at the bottom of the zip-line.

193.   Vail's guides instructed the group to then look for the guide waiting at the landing platform and to look for the guide giving certain arm and/or hand signals.

194.   Vail's guides instructed the group that certain arm and/or hand signals meant the guest should try to gain speed by tucking into a cannonball-type position.

31

195.   Vail's guides instructed the group that certain other arm and/or hand signals meant the guest should try to slow down by stretching out their body into a wider position including extending and spreading their legs.

196.   Vail's guides repeatedly instructed the group to "trust the equipment" and reassured them that the braking system equipment and components would stop them at the bottom of the zip-line.

197.   Vail's guides repeatedly instructed the group to "trust the equipment" and reassured them that the braking system equipment and components would stop them at the bottom of the zip-line regardless of their body position on approaching the bottom of the zip-line.

198.   Vail's guides, as well as other supervisors, guides, and personnel employed by Vail, repeatedly instructed Mrs. Cowles, her husband, and other guests on the course and in the lodge to "trust the equipment" on July 7, 2017.

199.   This was the same equipment that was subject to the June, 2017 braking system failure.

200.   Vail's guides also repeatedly instructed Mrs. Cowles, her husband, and the group that they might not have enough momentum on approaching the platform at the bottom of a zip-line to actually reach the platform and that they could wind up stopping short of the platform if they did not have sufficient momentum to reach the platform.

201.   Vail's guides repeatedly advised Mrs. Cowles, her husband, and the group that "someone would have to come out [onto the zip-line] to get them" if their momentum failed to carry them all the way to the platform and they instead stopped short of the platform.

202.   After providing instruction to the group, one of the two Vail guides clipped their harness onto the trolley and launched down the first zip-line from the first tower towards the second

tower.

203.   After receiving an "all clear" by radio from the first Vail guide, the second Vail guide then sent each member of the group down the first zip-line from the first tower towards the second tower one at a time.

204.   Each guest in the group was sent down the first zip-line and received at the second tower before the next guest was sent down the zip-line.

205.   After all the guests had been sent down the zip-line, the second Vail guide then traveled down the first zip-line and was received at the second tower.

206.   Throughout this entire procedure, the two Vail guides were supposed to remain in constant radio contact so as to advise each other when a guest had been received, when the braking system at the bottom of the zip-line had been retrieved, redeployed, and reset such that another guest could be safely sent down the zip-line, and when another guest had been sent down the zip-line.

207.   After completing the first zip-line, the two guides led the group to the second zip-line and sent and received each guest down that line in similar fashion, maintaining constant radio contact, without apparent incident.

208.   The two Vail guides then led the group to the third zip-line and sent and received each guest down that line in similar fashion, maintaining constant radio contact, without apparent incident.

### Vail Temporarily Suspends Zip-Line Tour Operations on the Game Creek Zip-Line Course Due to Inclement Weather

209.   The Vail guides were then contacted by Vail's course supervisor via radio and instructed to suspend operations and return with the group to the lodge due to lightning in the area.

210.   The Vail guides led the group down off the tower and to a waiting vehicle which

33

drove the group back to the lodge atop Vail Mountain.

211.   The group did not complete the fourth zip-line on the course before being guided back to the lodge.

212.   Upon returning to the lodge, Mrs. Cowles and her husband joined a larger group of other guests waiting to see whether the tour would be resumed after the weather cleared.

213.   Upon returning to the lodge, Mrs. Cowles and her husband did not see the two Vail guides again during the remainder of their day on the zip-line course.

214.   Upon returning to the lodge, Mrs. Cowles and her husband assumed their zip-line tour was over due to inclement weather.

215.   Shortly after returning to the lodge, however, Vail's course supervisor advised Mrs. Cowles, her husband, and other waiting guests that they had the option to either end their tour, take the gondola down to the base area, and obtain a fifty percent refund or to be led back out onto the course and to resume their tour being guided down the remaining zip-lines.

216.   At all relevant times, Vail's course supervisor was an employee and/or agent of Vail and was acting within the course and scope of his employment and/or within his actual or apparent authority as an agent of Vail.

217.   Mrs. Cowles and her husband elected to be led back out onto the course and to resume their tour being guided down the remaining zip-lines on the Game Creek course.

218.   A number of other guests waiting in the lodge also elected to be led back out onto the course and to resume their tours being guided down the remaining zip-lines.

219.   Vail's course supervisor then advised Mrs. Cowles, her husband, and the other guests that they would be led down the remaining zip-lines one at a time rather than in small groups as had been done during the first half of the tour.

220.   Vail's course supervisor advised Mrs. Cowles, her husband, and the other guests that they were not to wait for other guests on the platform after being received from the zip-line, as had been done during the first half of the tour, but were to proceed immediately to the next zip-line, where they would then be sent down the zip-line by a waiting guide.

221.   Mrs. Cowles and her husband then observed Vail's course supervisor instructing the Vail guides waiting in the lodge that they were each going to be stationed at individual tower platforms along the remaining zip-lines, where they would send and receive guests one at a time, rather than being assigned to accompany and guide a small group of guests down the remaining zip-lines on the course as had been done during the first half of the tour.

222.   Mrs. Cowles and her husband observed that some of the waiting Vail guides appeared confused by this instruction.

223.   Mrs. Cowles and her husband observed that some of the waiting Vail guides appeared confused as to what radio channel or channels they were supposed to use in communicating with other Vail guides while stationed on the platforms connecting the remaining zip-lines and while sending and receiving guests down the remaining zip-lines.

224.   At no time did Vail's course supervisor or any other employee or agent of Vail tell Mrs. Cowles or her husband that ordinary course operation procedures would be disregarded during their resumed tour down the Game Creek zip-line course.

225.   At no time did Vail's course supervisor or any other employee or agent of Vail tell Mrs. Cowles or her husband that the guides sent back out onto the course might be tasked with continuing course operations under procedures with which they were not familiar or trained or as to which they were confused.

226.   At no time did Vail's course supervisor or any other employee or agent of Vail tell

Mrs. Cowles or her husband that the Vail guides might be tasked with or otherwise asked or made to send guests down the zip-lines without first obtaining or receiving radio confirmation that the braking system and braking system equipment and components had been safely retrieved, redeployed, and reset at the bottom of the zip-line.

### Vail Resumes Zip-Line Tour Operations on the Game Creek Zip-Line Course Including Plaintiff's Zip-Line Tour

227.   Mrs. Cowles and her husband were then led from the lodge to the next tower on the Game Creek course with a group of ten to twelve other guests.

228.   Mrs. Cowles, her husband, and the other guests were led to the platform atop the tower by a single Vail guide, who then began sending guests down the next zip-line one at a time as instructed by Vail's course supervisor.

229.   This was the longest zip-line on the Game Creek course.

230.   This zip-line was approximately one-half mile in length.

231.   This zip-line was designed to travel through a cluster of trees before it emerged from the trees just before a tower landing platform at the bottom of the zip-line.

232.   The cluster of trees obscured the view of the platform at the bottom of the zip-line from the platform at the top of the zip-line, and vice versa.

233.   A guide or guest standing on the platform at the top of the zip-line could not see the platform at the bottom of the zip-line due to the distance and the cluster of trees between the top platform and the bottom platform, and vice versa.

234.   As the Vail guide began to send the other guests in the group down the zip-line, Mrs. Cowles and her husband did not observe the guide regularly using radio communications to obtain confirmation from the guide waiting at the bottom of the zip-line that a guest had been received at the bottom platform or that it was safe to send the next guest down the zip-line.

235.   As the Vail guide began to send the other guests in the group down the zip-line, Mrs. Cowles and her husband did not observe the guide regularly waiting for a radio communication from the guide at the bottom tower that the braking system and braking system equipment and components had been properly retrieved, redeployed, and reset such that it would be safe to send the next guest down the zip-line.

236.   The Vail guide on the platform sent each of the other guests down the zip-line, one at a time, leaving Mrs. Cowles and her husband as the last two guests waiting on the platform.

237.   As the Vail guide sent the other guests down the zip-line, Mrs. Cowles and her husband observed the guide asking guests if they "wanted a push" to get them started down the zip-line.

238.   Mrs. Cowles and her husband observed some guests answering that they "wanted a push" and receiving a "push" from the guide as they started off the platform down the zip-line including a young girl.

239.   The Vail guide advised Mrs. Cowles and her husband that this was the longest and slowest zip-line on the entire Game Creek course.

240.   Mrs. Cowles thus anticipated that the zip-line would be slower or, at most, approximately the same speed as the other zip-lines she had been guided down earlier in the day.

241.   While clipping Mrs. Cowles's harness onto the trolley, the Vail guide asked Mrs. Cowles if she wanted a "push" to get her started down the zip-line.

242.   Mrs. Cowles declined the guide's offer.

243.   The Vail guide also advised Mrs. Cowles to be ready to tuck into a cannonball-type position if it appeared on her approach to the bottom tower that she was not going to have enough momentum to reach the platform at the end of the zip-line and might instead stop short of the

37

landing platform at the end of the zip-line.

244.   The Vail guide then sent Mrs. Cowles down the zip-line.

### Plaintiff Suffers Serious and Permanent Injuries in the Subject Zip-Line Accident

245.   Upon emerging from the trees near the bottom of the zip-line, Mrs. Cowles found herself traveling down the zip-line at a much faster speed than she had anticipated and been informed by the Vail guide.

246.   Upon emerging from the trees near the bottom of the zip-line, Mrs. Cowles found the bottom tower approaching at a much faster rate than she had anticipated and been informed by the Vail guide.

247.   Upon emerging from the trees near the bottom of the zip-line, Mrs. Cowles looked for the red or orange flag on the braking system equipment and components as previously instructed by the guides throughout the day.

248.   Upon emerging from the trees near the bottom of the zip-line, Mrs. Cowles looked for the red or orange flag on the braking system equipment and components as previously instructed by the guides throughout the day but could not see a flag.

249.   At that time, Mrs. Cowles looked for the Vail guide on the bottom platform giving her the arm and/or hand signals discussed by the guides earlier that day.

250.   At that time, Mrs. Cowles observed that the Vail guide on the bottom platform was not giving her the arm and/or hand signals discussed by the Vail guides earlier that day.

251.   Instead, Mrs. Cowles saw the Vail guide jumping up and down and waving his arms.

252.   At that time, it appeared to Mrs. Cowles that the Vail guide was trying to verbally call out to her as well.

253.   At that time, Mrs. Cowles could not hear what the Vail guide was saying.

254.   At that time, Mrs. Cowles realized she was going to collide with the braking system equipment and components on the zip-line at a high rate of speed.

255.   At that time, Mrs. Cowles braced herself for the impact.

256.   At that time, Mrs. Cowles was confident that she would be fine if she "trusted the equipment" to safely stop her as previously instructed by the Vail guides, supervisors, and personnel throughout the day.

257.   As she approached the bottom tower, Mrs. Cowles observed the Vail guide on the platform running and/or jumping out of the way to avoid being struck as she approached the platform at a high rate of speed.

258.   Mrs. Cowles then collided with the first component of the braking system on the zip-line at a high rate of speed.

259.   The first component of the braking system failed to slow, stop, or arrest Mrs. Cowles' momentum down the zip-line.

260.   The first component of the braking system, which consisted of a Zip Stop component rigged and attached to a brake bobbin by a cable attached to various other cables or ropes, appeared to break, fail, or explode as Mrs. Cowles struck it.

261.   Vail and Bonsai have each contended since the subject accident that the primary braking system components selected, prepared, assembled, tested, installed and used by Bonsai and Vail failed, either in whole or in part, because the redirection cord failed, broke, or was severed – the same failure mode as occurred during the June 24, 2017 braking system failure and a failure mode of which Bonsai and Vail had notice and actual knowledge well before July 7, 2017.

262.   After striking the first component of the braking system, Mrs. Cowles continued down the zip-line towards the remaining components of the braking system and towards the tower

and landing platform at a high rate of speed.

263.   Mrs. Cowles then collided with other objects at the bottom of the zip-line including but not limited to other components of the braking system and/or the tower, landing platform, and/or other fixtures, equipment, or components on the zip-line, at a high rate of speed.

264.   The secondary or "emergency" components of the braking system also failed to safely slow, stop, or arrest Mrs. Cowles' momentum down the zip-line or to prevent her from colliding with objects at the bottom of the zip-line at a high rate of speed.

265.   At all relevant times prior to July 7, 2017, Bonsai had notice and actual knowledge of the failure mode where the secondary or "emergency" components of its braking system design, including but not limited to the EAD and Brake Bobbin components, could fail and malfunction due to modifications previously made to the braking system with Bonsai's knowledge and approval in or about April, 2017.

266.   The impact of Mrs. Cowles's crash was so powerful as to be audible to her husband and the other Vail guide waiting at the top tower approximately one half-mile up the zip-line.

267.   The impact of Mrs. Cowles's crash was so powerful as to cause the entire zip-line and the top tower to shake and/or sway approximately one half-mile away.

268.   Mrs. Cowles suffered significant injuries as a result of colliding with the braking system equipment and course fixtures including but not limited to a type 1 open patellar fracture, traumatic right knee arthrotomy, sprained right ankle, sprained left great toe, multiple bruises, lacerations, and abrasions to her legs and face, and a concussion and traumatic brain injury.

269.   Immediately after the crash, Mrs. Cowles and her husband both heard the Vail guide on the bottom tower platform screaming into the radio that Mrs. Cowles's braking equipment had "exploded" when she hit it.

270.   Immediately after the crash, Mrs. Cowles and her husband both heard the Vail guide on the bottom tower platform screaming into the radio, "do not send next zip-liner," or words to that effect.

271.   Mrs. Cowles was belayed down from the tower platform to the ground and transported by gurney to a waiting ATV, which drove her to the top of the gondola where she was met by her husband.

272.   Mrs. Cowles and her husband were transported by gondola down to the base area at Vail, where an ambulance took Mrs. Cowles to a local hospital to receive emergency medical care for her injuries.

273.   Mrs. Cowles was subsequently admitted to a local hospital for emergency knee surgery and spent several days there before being released to fly back home to Wisconsin.

### Vail's Post-Incident Investigation

274.   Several hours after Mrs. Cowles's accident, a Vail risk manager texted the chief executive officer of Bonsai, stating, "Please call me [sic] we had a second incident on Game Creek. We need to talk ASAP."

275.   The Vail risk manager also texted, "Any chance bonsai [sic] has an extra EAD? We would want one if you have one. By the way the persons [sic] weight was 140."

276.   At that time, Bonsai's chief executive officer texted back to Vail's risk manager, "Crap" and "Let me check."

277.   As a condition of its licensure by the State of Colorado to operate the Game Creek course, Vail was required to report Mrs. Cowles's injury event to state authorities within 72 hours of learning of her injury. *See* 7 CCR 1101-12:4-1.

278.   Vail submitted an injury report to the Division on or about July 10, 2017.

279.   Although the Division's "Amusement Rides and Devices Injury Report" form required amusement operators like Vail to state on the form "what happened to cause the injury," Vail failed to include any such information on the form it submitted to the Division on July 10, 2017.

280.   Vail should have closed down the Game Creek zip-line course before Plaintiff Lisa Cowles's accident on July 7, 2017 because it was on ample notice by that date that the braking system, equipment, and components in use on the course were prone to failure and malfunction during foreseeable use that exposed guests on the course to substantial and unreasonable risk of serious injury or death.

281.   Vail's decision to continue operating the course despite this actual knowledge of problems, failures, and malfunctions of the braking system, equipment, and components on the course was grossly negligent, reckless, and willful, and evidenced conscious disregard for the safety and well-being of Vail's guests including the Plaintiff.

282.   After the accident, Vail and Bonsai failed to reach agreement as to the cause of the accident and effectively blamed each another for the accident.

283.   Vail approved and ratified the conduct of its guides, supervisors, and employees involved in the subject accident as part of its internal investigation.

284.   Vail closed down and did not reopen the Game Creek zip-line course for the remainder of the 2017 summer tourism season.

285.   Upon information and belief, the closing of the Game Creek zip-line course cost Vail millions of dollars in lost revenue during the 2017 summer tourism season.

286.   The closing of the Game Creek zip-line course ultimately resulted in replacements, retrofits, or repairs being made to all braking systems on the Game Creek course prior to re-

opening.

287.   Vail re-opened the Game Creek zip-line course in time for the 2018 summer tourism season.

288.   Upon information and belief, the Game Creek zip-line course may have generated tens of millions of dollars from resumed operation since Mrs. Cowles's injuries in the subject accident of July 7, 2017.

### Vail's Post-Incident Communications with Plaintiff and Her Husband

289.   Mrs. Cowles's husband was contacted by a representative of Vail within one to two months of Mrs. Cowles's injuries in the subject accident of July 7, 2017.

290.   Vail's representative asked the Cowles to provide medical records, medical bills, and updated information on Mrs. Cowles's injuries and medical treatment, which was ongoing for months after the subject accident (and which is still ongoing to date).

291.   From that time and continuing for a period of at least six to seven months thereafter, the Cowles obliged Vail's request and sent all information and documents requested by Vail's representative.

292.   Over the next several months, Vail's representative repeatedly indicated to the Cowles that Vail would be assuming responsibility for the accident and was prepared to compensate Mrs. Cowles for her injuries in that accident.

293.   Over the next several months, Vail's representative repeatedly advised Mrs. Cowles and her husband that Vail would "take care of everything" and that Mrs. Cowles "did not do anything wrong" to cause the subject accident.

294.   In or about August, 2018, Vail's representative advised Mrs. Cowles that Vail had determined that the accident was caused by defective braking system equipment designed and

43

manufactured by Bonsai and that Vail was not responsible for the accident or her injuries.

295.   At that time, Vail's representative advised Mrs. Cowles that Vail was "tendering the claim" to Bonsai and provided Mrs. Cowles with contact information for an insurance adjuster representing Bonsai's liability insurance carrier.

296.   As noted above, Bonsai continues to design and build outdoor recreational attractions for major resort clients like Vail including large-scale zip-lining courses and canopy tours at Vail ski resort properties throughout the United States.

297.   Guests have continued to suffer injuries at zip-line courses owned and operated by Vail since the date of Ms. Cowles's accident.

298.   For example, guests allegedly suffered injuries in accidents on Vail's zip-lining courses at Heavenly in July, 2017; August, 2018; and July, 2019.

299.   Similarly, a guest allegedly suffered injury in an accident on Vail's zip-lining course in Breckenridge in July, 2019.

300.   The July, 2019 injury accident on Vail's zip-lining course at Breckenridge is alleged to have occurred due to the failure and malfunction of custom braking equipment Vail used on the course.

301.   Some of the allegations herein have been made and/or may be perceived to have been made in the alternative. *Accord* Fed. R. Civ. P. 8(d)(2). Plaintiff will elect which claims and allegations she intends to pursue before the time of trial.

## COUNTS AGAINST BONSAI DESIGN

### COUNT I
### Strict Liability v. Bonsai

302.   Plaintiff incorporates all other allegations in this complaint as if set forth herein.

303.  At all relevant times, Bonsai was in the business of designing, engineering, testing (or failing to adequately test), manufacturing, constructing, building, assembling, installing, maintaining, preparing, and/or inspecting zip-line courses and zip-line equipment and components including but not limited to the Game Creek course, and including but not limited to the braking system and braking system equipment and components used on the subject zip-line where Mrs. Cowles's accident occurred on July 7, 2017.

304.  Bonsai designed, engineered, tested (or failed to adequately test), manufactured, constructed, built, assembled, installed, maintained, prepared, and/or inspected the subject Game Creek zip-line course, all fixtures on the course such as zip-lines, towers, and platforms, and all zip-line equipment and components used on the course on the date of Mrs. Cowles's zip-line accident, including but not limited to all braking systems and braking system equipment and components.

305.  At the time the subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were sold and left the control of Bonsai, they were defective and unreasonably dangerous to a person who might reasonably be expected to use them. The subject systems, equipment, and components were defective and unreasonably dangerous in one or more respects as set forth elsewhere herein.

306.  The subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were insufficient to provide reasonable protection to guests on the Game Creek zip-line tour including but not limited to Plaintiff, Lisa Cowles.

307.  The subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, failed to properly slow, stop, and arrest

45

Plaintiff's forward motion down the subject zip-line, allowing her to crash at high speed and causing her to suffer serious and permanent injuries.

308.  The subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were unreasonably susceptible to failing while being used in their intended manner.

309.  The subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, lacked reasonable resistance to failing during foreseeable use.

310.  The subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were designed and manufactured in a manner that resulted in failure during foreseeable use.

311.  The subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were not appropriate or fit to be used to slow, stop, and arrest riders approaching the bottom of the zip-line or to otherwise protect their safety and protect them from risk of serious injury or death on the course.

312.  The subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were unreasonably dangerous and defective and not appropriate or fit for their intended use because they lacked a sufficient passive braking system and a sufficient secondary or emergency braking system.

313.  The subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were unreasonably dangerous and defective and not appropriate or fit for their intended use because they lacked any braking equipment or means for a guest on the course to independently slow or stop themselves so as to avoid a serious

accident while on the course.

314.   The subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were unreasonably dangerous and defective and not appropriate or fit for their intended use because they lacked sufficient padding or other protective gear.

315.   The subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, lacked adequate warnings regarding their deficiencies and propensity to fail under foreseeable use and conditions.

316.   It is believed that the subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, may suffer from additional unspecified defects which will be ascertained and confirmed upon the opportunity to conduct reasonable discovery.

317.  The subject zip-line course was also designed and built by Bonsai in an unreasonably dangerous and defective manner.

318.   The subject zip-line course was itself unreasonably dangerous and defective insofar as it was designed and built to cause guests like Plaintiff to arrive at the landing platform at the bottom of a zip-line at an unreasonably fast and dangerous rate of speed.

319.   The subject zip-line course was itself unreasonably dangerous and defective insofar as it was designed and built in a fashion that deprived guests like Plaintiff of the ability to clearly see and perceive the landing platform at the bottom of a zip-line from a safe distance up the zip-line.

320.   The subject zip-line course was itself unreasonably dangerous and defective insofar as it was designed and built in a fashion that deprived guests like Plaintiff of the ability to clearly

see and perceive the braking systems and braking system equipment and components at the bottom of a zip-line from a safe distance up the zip-line.

321.   The subject zip-line course was itself unreasonably dangerous and defective insofar as it was designed and built in a fashion that deprived guests like Plaintiff of the ability to independently slow, stop, and arrest their speed on approaching a landing platform at the bottom of a zip-line.

322.   At the time the subject zip-line course was sold and left the control of Bonsai, it was defective and unreasonably dangerous to a person who might reasonably be expected to use it.

323.   The subject zip-line course, including all of its components and parts, was expected by Bonsai to reach, and did reach, Vail without substantial change in the condition it was in at the time that it was manufactured and sold by Bonsai.

324.   At the time of the subject accident, the subject zip-line course and zip-line equipment and components, including but not limited to the subject braking system and braking system equipment and components, were being used in a manner and fashion that was foreseeable to Bonsai and in a manner in which they were intended to be used.

325.   The subject zip-line course and zip-line equipment and components, including but not limited to the subject braking system and braking system equipment and components, were defective and unreasonably dangerous because their design, construction, manufacturing, assembly, and/or installation processes created a risk of harm to persons which would not ordinarily be expected and which was not outweighed by the benefits to be achieved by their design.

326.   Lisa Cowles was a person who would reasonably be expected to use or be affected by the subject zip-line course and zip-line equipment and components, including but not limited

to the subject braking system and braking system equipment and components.

327.   The subject zip-line course and zip-line equipment and components, including but not limited to the subject braking system and braking system equipment and components, suffered a catastrophic failure to slow, stop, and arrest a foreseeable user's forward motion down the zip-line at foreseeable speeds, causing Lisa Cowles to crash and causing serious and permanent injuries to Lisa Cowles.

328.   Defects in the subject zip-line course and zip-line equipment and components, including but not limited to the subject braking system and braking system equipment and components, caused the crash that permanently injured Lisa Cowles.

329.   As a direct and proximate result and consequence of the conduct of Bonsai Design, and the defective and unreasonably dangerous nature of its products, Plaintiff, Lisa Cowles suffered injuries, damages, and losses as described elsewhere herein.

**WHEREFORE,** Plaintiff prays for judgment against Bonsai Design in an amount to be determined at trial and for such other and further relief as the Court deems just and proper.

**COUNT II**
**Negligence v. Bonsai**
**(Dismissed With Prejudice)[2]**

---

[2] The Court dismissed Plaintiff's Count II against Bonsai "with prejudice" by written Order dated June 5, 2020. [*See* Doc. #167, at pp. 14-18, 20]. The dismissed Count, however, contains factual allegations that are incorporated by reference into Plaintiff's remaining active counts, including her gross negligence count, which has not been dismissed and which remains in the case. *Accord* Fed. R. Civ. P. 10(c) [*See also* Doc. #167, at pp. 18-21]. Consistent with the Court's instruction that "Plaintiff is permitted to file a Third Amended Complaint fully consistent with this order by no later than June 15, 2020," [*see* Doc. #167, at p. 20-21] and in a good faith effort to comply with the Court's June 5 Order, Plaintiff has clearly denominated the dismissed Count II as "dismissed with prejudice" in this Third Amended Complaint being filed with the Court but has not deleted the Count both because it contains factual allegations properly incorporated by reference elsewhere in the Complaint and to avoid confusion arising from moving these allegations to other sections of the Complaint, which would additionally require re-numbering the allegations.

330.   Plaintiff incorporates all other allegations in this complaint as if set forth herein.

331.   At all relevant times, Bonsai was in the business of designing, engineering, testing (or failing to adequately test), manufacturing, constructing, building, assembling, installing, maintaining, preparing, and/or inspecting zip-line courses and zip-line equipment and components including but not limited to the Game Creek course, and including but not limited to the braking system and braking system equipment and components used on the subject zip-line where Mrs. Cowles's accident occurred on July 7, 2017.

332.   At all relevant times, Bonsai had a duty to design, engineer, test, manufacture, construct, build, assemble, install, maintain, prepare, and inspect its zip-line courses and zip-line equipment and components, including but not limited to zip-lines, towers, platforms, zip-line course equipment and components, and braking systems, equipment, and components, so that the zip-lines, towers, platforms, equipment, and components would be resistant to failure which Bonsai Design knew would pose serious risks to consumers using the equipment and components.

333.   At all relevant times, Bonsai Design had a duty to ensure that the subject zip-line course and all fixtures, equipment, and components in use on the course would effectively slow down, stop, and arrest the forward motion of guests down the zip-lines before they were subjected to a potentially injurious impact, including but not limited to crashes at unreasonably dangerous and fast speeds.

334.   Bonsai Design's duties in this regard were especially critical because its design of the subject zip-line course, fixtures, equipment, and components did not provide guests on the course with any means to slow or stop themselves.

335.   Bonsai Design was negligent in failing to exercise reasonable care to prevent the design of the subject zip-line course from creating an unreasonable risk of harm to persons who

might reasonably be expected to use or be affected by the course while it was being used in a manner Bonsai Design might reasonably have expected.

336.  Bonsai Design was negligent in failing to exercise reasonable care to prevent the subject zip-line course equipment, including but not limited to braking systems and braking system equipment and components, from creating an unreasonable risk of harm to persons who might reasonably be expected to use or be affected by the equipment and components while they were being used in a manner Bonsai Design might reasonably have expected.

337.  Lisa Cowles is in that class of persons whom Bonsai Design should reasonably have expected to use or be affected by the subject zip-line course and subject zip-line equipment and components including but not limited to the subject braking system equipment and components.

338.  Bonsai Design was negligent in failing to exercise reasonable care to warn users of the subject zip-line course and subject zip-line equipment and components of the risk of harm associated with the foreseeable use of that course and the equipment and components.

339.  At the time the subject zip-line course was designed and built, Bonsai Design was aware of the importance and need for proper design and construction of the course including but not limited to location and placement of zip-lines, towers, and platforms.

340.  At the time the subject zip-line equipment and components were designed, engineered, manufactured, assembled, and installed on the Game Creek course, including but not limited to the subject braking system, equipment, and components, Bonsai Design was aware of the importance and need for proper design, manufacture, and installation of these systems, equipment, and components.

341.  At the time the subject zip-line course was designed and built and the subject zip-line equipment and components, including but not limited to the subject braking system,

equipment, and components, were designed, engineered, manufactured, assembled, and installed on the course, Bonsai Design was aware that failing to properly design and build the course and to design, manufacture, assemble, and install the equipment and components on the course would subject users to risk of serious injury or death, including but not limited to serious injury or death resulting from the failure of the equipment or components on the course to prevent serious injury or death.

342.  At the time the subject zip-line course was designed and built, Bonsai Design was aware of one or more flaws in its design and/or construction of the course, including but not limited to flaws in the placement and positioning of zip-lines, towers, and platforms that could subject foreseeable users to unreasonably high and dangerous speeds and/or deprive them of adequate sightlines and time to avoid a high-speed accident while using the course in its intended manner and for its intended purpose.

343.  At the time the subject zip-line equipment and components were designed, engineered, manufactured, assembled, and installed on the course, including but not limited to the subject braking system, equipment, and components, Bonsai Design was aware of one or more flaws in its designs, engineering, manufacturing, assembly, and installation of the equipment and components.

344.  Bonsai Design knew or should have known that its designs, engineering, manufacturing, assembly, and installation of the subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were likely to produce equipment and components that lacked reasonable resistance to failure during foreseeable use and that were unreasonably susceptible to failure during foreseeable use.

345.  Bonsai Design knew or should have known that its designs, engineering,

manufacturing, assembly, and installation of the subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were likely to produce equipment and components that were likely to fail and cause serious injury or death to users during foreseeable use.

346.   At the times the subject zip-line course was designed and built, Bonsai Design knew or should have known that the flaws in its design and construction of the course would subject users like Lisa Cowles to risk of serious injury or death when using the course under foreseeable conditions.

347.   Bonsai Design was aware of changes it could make to its design and construction of the subject course that would improve the positioning of zip-lines, towers, and platforms, improve course speeds and sightlines, and improve the overall safety of the course, but deliberately chose not to make those changes.

348.   At the time the subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, were designed, engineered, manufactured, assembled, and installed on the Game Creek course, Bonsai Design knew or should have known that the flaws in its designs, engineering, manufacturing, assembly, and installation of the equipment and components would subject users like Lisa Cowles to risk of serious injury or death when using the equipment and components under foreseeable conditions.

349.   Bonsai Design was aware of changes it could make to its designs, engineering, manufacturing, assembly, and installation of the subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, that would improve the strength, durability, and resistance of the equipment and components to failure during foreseeable use, but deliberately chose not to make those changes.

53

350.  Bonsai Design's knowledge as described in this Complaint is believed to be reflected in internal communications, testing, and/or quality inspections.

351.  Bonsai Design's knowledge as described in this Complaint is believed to be reflected in reports of other incidents of accidents on similar zip-line courses and of other incidents of zip-line equipment and/or component failure, including but not limited to braking system and/or braking system equipment and/or component failure, and including other incidents involving zip-line courses, zip-lines, towers, platforms, systems, equipment, and/or components with similarly defective designs and/or which were similarly engineered, manufactured, built, assembled, and/or installed under similarly defective processes and conditions.

352.  Bonsai Design acted unreasonably in designing and building the subject zip-line course with defects and deficiencies making the course likely to result in accidents under conditions that would present an unreasonable risk of injury or death to users like Lisa Cowles.

353.  Bonsai Design acted unreasonably in designing, engineering, manufacturing, assembling, and installing the subject zip-line equipment and components, including but not limited to the subject braking system, equipment, and components, with defects and deficiencies making the equipment and components likely to experience a failure under conditions that would present an unreasonable risk of injury or death to users like Lisa Cowles.

354.  At all relevant times, Bonsai Design was also in the business of providing operational support for its large-scale zip-line courses like the Game Creek course, including but not limited to training, inspection, maintenance, operational policies and procedures, and repair services.

355.  At all relevant times, Bonsai Design was negligent in failing to exercise reasonable care as described elsewhere herein and as further set forth below:

a.  Failing to provide adequate training on operational protocols and safe zip-line course operations including but not limited to protocols and operations relating to inspecting and maintaining braking systems and braking system equipment and components, sending and receiving guests from zip-line platforms, retrieving, redeploying, and resetting braking systems and braking system equipment and components on the zip-line before sending a guest down the zip-line, maintaining radio communications to facilitate safe operations of the zip-line, braking systems, and braking system equipment and components, and the importance of following established operational and safety protocols at all times;

b.  Failing to provide appropriate inspection and maintenance services including but not limited to timely inspection and maintenance of braking systems and braking system equipment and components, recognizing defects, damage, wear, and other conditions of such systems, equipment, and components, performing or approving inappropriate modifications and/or repairs to such systems, equipment, and components, failing to timely perform appropriate modifications and/or repairs to such systems, equipment, and components, and recognizing when such systems, equipment, and components needed to be repaired or replaced before the zip-line could be safely operated;

c.  Failing to develop and implement appropriate protocols for safe zip-line course operations including but not limited to protocols relating to inspecting and maintaining braking systems and braking system equipment and components, sending and receiving guests from zip-line platforms, retrieving, redeploying, and resetting braking systems and braking system equipment and components on the

zip-line before sending a guest down the zip-line, maintaining radio communications to facilitate safe operations of the zip-line, braking systems, and braking system equipment and components, and the importance of following established operational and safety protocols at all times;

d. Failing to provide reasonable operational support as described elsewhere herein;

e. Providing operational support in an otherwise unreasonable fashion as described elsewhere herein;

f. Failing to provide Vail with a zip-line system containing a braking system that would properly and safely slow, stop, and arrest the forward motion of guests while approaching the bottom of the zip-line so as to prevent injurious contact between the guests and objects and structures at the bottom of the zip-line including but not limited to collisions occurring at high speeds;

g. Designing, manufacturing, assembling, preparing, and installing a zip-line braking system, including braking system equipment and components, that had a propensity to fail and malfunction while being used in a foreseeable and intended manner;

h. Utilizing a zip-line design that included braking systems, equipment, and components that it either knew or should have known had a propensity to fail and malfunction while being used in a foreseeable and intended manner;

i. Designing, manufacturing, assembling, preparing, and installing a zip-line braking system, including braking system equipment and components, that lacked any equipment or means for guests to independently slow, stop, and arrest their forward motion while approaching the bottom of the zip-line;

j. Designing, manufacturing, assembling, preparing, and installing a zip-line braking

56

system, including braking system equipment and components, that lacked sufficient redundancies to prevent injurious contact between guests and objects and structures at the bottom of the zip-line, including but not limited to collisions occurring at high speeds, in the event of a failure or malfunction involving the braking system, equipment, or components;

k.   Marketing and representing that the custom braking systems it designed and installed on the Game Creek zip-line course possessed sufficient redundancies and similar safety features when it knew or should have known its systems in fact lacked such redundancies and features or that such redundancies and features might fail to perform as represented while being used in a foreseeable manner;

l.   Prioritizing user "through-put" and maximizing the number of guests a course operator could run down a zip-line within a given timeframe, rather than guest safety and system and component reliability, in the design of the zip-lines, braking systems, and braking system equipment and components it assembled and installed on the Game Creek zip-line course;

m.   Failing to consider and integrate feasible alternative designs, including additional safety features, that afforded greater protection to users than the designs selected and installed on the Game Creek course; and

n.   Such other and further acts of negligence as may be revealed in discovery.

356.   As a direct and proximate result and consequence of the negligent and unlawful conduct of Bonsai Design, Plaintiff, Lisa Cowles suffered injuries, damages, and losses as described elsewhere herein.

**WHEREFORE,** Plaintiff prays for judgment against Bonsai Design in an amount to be

determined at trial and for such other and further relief as the Court deems just and proper.

## COUNTS AGAINST VAIL

### COUNT III

357.   Plaintiff incorporates all other allegations in this complaint as if set forth herein.

358.   At all relevant times, the provisions of Colorado's Premises Liability Act, C.R.S. § 13-21-115, were in effect.

359.   At all relevant times, Vail was a "landowner" of the Game Creek zipline course as that term is defined by statute. *See* C.R.S. § 13-21-115(1).

360.   At all relevant times, Vail was legally responsible for the condition of the premises and/or for the activities conducted and/or the circumstances existing on the Game Creek zip-line course, which have been described elsewhere herein.

361.   At all relevant times, Plaintiff, Lisa Cowles, was an "invitee" on the Game Creek zipline course as that term is defined by statute. *See* C.R.S. § 13-21-115(5)(a).

362.   At all relevant times, Vail owed Plaintiff, Lisa Cowles, a duty of reasonable care to protect against dangers of which it actually knew or should have known; to warn of dangers that it did not create and that were not ordinarily present on the type of property but of which it actually knew; and to refrain from causing injury by willful or deliberate conduct, including conduct characterized as "gross negligence" and/or "willful and wanton conduct" under Colorado law. *See* C.R.S. § 13-21-115(3)(a)-(c), (3.5).

363.   At all relevant times, Vail breached its duty as described elsewhere herein and including but not limited to by the following acts and omissions:

> a.   Failing to operate the Game Creek zip-line course in a safe and responsible manner;
>
> b.   Failing to train and supervise its employees to operate the Game Creek zip-line

course in a safe and responsible manner;

c.  Failing to adopt and enforce protocols for the safe operation of the Game Creek zip-line course and to ensure the safety of guests on the course including Plaintiff;

d.  Failing to follow its own protocols for the safe operation of the Game Creek zip-line course;

e.  Operating the Game Creek zip-line despite its defective and unreasonably dangerous design and construction, including but not limited to the placement of zip-lines, towers, and platforms so as to promote and allow unreasonably high and dangerous speeds, the lack of adequate sightlines, and the lack of adequate distance for the forward motion of users down a zip-line to be slowed, stopped, and arrested;

f.  Operating the Game Creek zip-line course with defective and unreasonably dangerous zip-line equipment and components including but not limited to defective and unreasonably dangerous braking systems and braking system equipment and components;

g.  Failing to timely and appropriately inspect zip-lines, towers, platforms, trees, and other objects and fixtures on the Game Creek zip-line course so as to prevent guests from reaching unreasonably dangerous and fast speeds after being sent down a zip-line and to otherwise ensure adequate sightlines and adequate distances for slowing, stopping, and arresting the forward motion of guests sent down a zip-line;

h.  Failing to timely and appropriately inspect, repair, and maintain the equipment and components on the Game Creek zip-line course including but not limited to braking systems and braking system equipment and components;

i.  Performing inappropriate alterations to the location and positioning of zip-lines,

59

towers, platforms, trees, and other objects and fixtures on the Game Creek zip-line course so as to allow guests to reach unreasonably dangerous and fast speeds after being sent down a zip-line and to otherwise deprive guests of adequate sightlines and adequate distances for slowing, stopping, and arresting their forward motion after being sent down a zip-line;

j.  Performing inappropriate modifications and/or repairs to equipment used on the course including but not limited to braking systems and braking system equipment and components;

k.  Subjecting guests including Plaintiff to unreasonable risk of serious injury or death by operating the Game Creek zip-line course in an unreasonable and unsafe manner;

l.  Failing to timely and appropriately advise guests including Plaintiff as to the risks and hazards on the Game Creek zip-line course;

m.  Failing to timely and appropriately instruct guests including Plaintiff as to how to avoid or minimize such risks and hazards on the Game Creek zip-line course;

n.  Failing to timely and appropriately provide guests including Plaintiff with appropriate zip-line equipment that was free from defects including but not limited to properly functioning braking systems and braking system equipment and components;

o.  Failing to timely and appropriately provide guests including Plaintiff with appropriate zip-line equipment that would provide such guests with an independent means of slowing, stopping, and/or arresting their speed so as to avoid serious injury or death on the Game Creek zip-line course;

60

p.   Designing and building the Game Creek zip-line course in an unsafe and unreasonable manner so as to expose guests on the course, including Plaintiff, to unreasonable risk of serious injury or death;

q.   Directing and/or allowing employees, supervisors, guides, and/or guests on the course to participate in unsafe practices on the Game Creek zip-line course that subjected guests to unreasonable risk of serious injury or death;

r.   Making false representations to guests including Plaintiff as to the risks and hazards of the Game Creek zip-line course;

s.   Failing to disclose and/or concealing material information concerning such risks and hazards from guests on the Game Creek zip-line course including Plaintiff;

t.   Failing to ensure the safety of guests on the Game Creek zip-line course;

u.   Failing to abide by and adhere to applicable laws, rules, and standards governing the operation of zip-line courses like the Game Creek zip-line course;

v.   Modifying or altering braking systems, equipment, and components in an unsafe and unreasonable manner;

w.   Making modifications or alterations to braking systems, equipment, and components when it knew that such modification or alterations would create a substantial risk of serious injury or death for guests on the Game Creek zip-line course;

x.   Failing to cease operations on the Game Creek zip-line course after learning of instances of guest injury and/or braking system failures on the course;

y.   Failing to cease operations on the Game Creek zip-line course after learning of instances of guest injury and/or braking system failures on the course and before

consulting the manufacturer(s) or such systems, equipment, and components as to any modifications or repairs that could be needed to address the danger and before ensuring that any such modifications or repairs were performed and that the systems, equipment, and components could be tested and certified as safe for resumed operations;

z.  Continuing to operate the Game Creek zip-line course despite knowing that the braking systems, equipment, and components in use on the course were experiencing problems and were subject to sudden failures and malfunctions that were likely to result in serious injury or death to guests on the course;

aa. Continuing to operate the Game Creek zip-line course under conditions that it knew created and subjected its guests to a substantial and unreasonable risk of serious injury or death associated with the sudden failure or malfunction of the braking systems, equipment, and components in use on the course;

bb. Concealing from its guests the fact that the braking systems, equipment, and components used on the Game Creek zip-line course were experiencing problems and were subject to sudden failures and malfunctions so as to create substantial and unreasonable risk of serious injury or death for guests in the event of such a failure or malfunction;

cc. Concealing from its guests the fact that the braking systems, equipment, and components used on the Game Creek zip-line course were experiencing problems and were subject to sudden failures and malfunctions so as to create a likelihood of serious injury or death for guests in the event of such a failure or malfunction;

dd. Directing or allowing supervisors, guides, and other personnel to depart from

established protocols, including protocols pertaining to safely sending and receiving guests on a zip-line, to radio communications ensuring safe zip-line operations, to safe, timely, and appropriate retrieval, redeployment, and resetting of all zip-line equipment and components including but not limited to braking systems, equipment, and components, with knowledge that directing or allowing such conduct created a substantial and unreasonable risk of serious injury or death to guests on the course;

ee. Directing or allowing supervisors, guides, and other personnel to falsely advise guests on the course that the equipment and components in use on the course, including braking systems, equipment, and components, would protect them from serious injury as long as they "trusted the equipment" while knowing that the braking systems, equipment, and components used on the Game Creek zip-line course were experiencing problems and were subject to sudden failures and malfunctions such that the braking systems, equipment, and components would not so protect guests on the course;

ff. Such other and further acts and omissions constituting gross negligence, willful and wanton conduct, or willful or deliberate conduct resulting in injury, or misconduct, that is barred under the Premises Liability Act, as described elsewhere herein; and

gg. Such other and further acts and omissions reflecting violations of Vail's statutory duties of care as may be revealed in discovery.

364. At all relevant times, Vail knew or should have known that the above acts and omissions subjected guests like Plaintiff to an unreasonable risk of serious injury or death and created and enhanced a substantial risk of an injurious accident such as occurred in this case.

365.   Vail nonetheless elected to engage in those acts and omissions and to direct its supervisors, guides, and other personnel to engage in such acts and omissions.

366.   Vail purposefully, intentionally, and willfully engaged in certain of those acts and omissions in order to induce guests such as Plaintiff, Lisa Cowles, to pay for zip-line tours on the Game Creek zip-line course and to not seek refunds or partial refunds of money paid for such zip-line tours, including the Plaintiff.

367.   The conduct of Vail set forth in this Count and throughout this complaint constituted gross negligence, including actions committed willfully and recklessly and with conscious disregard for the safety of others.

368.   The negligent, unreasonable, unsafe, grossly negligent, willful, wanton, fraudulent and/or deliberate acts and omissions described herein are contrary to the public policies expressed by the Legislature in enacting the Premises Liability Act, are barred under the Act, and are fully compensable under the Act. *See* C.R.S. § 13-21-115(1.5)(a), (c), (3)(a)-(c), (3.5).

369.   As a direct and proximate result and consequence of the negligent and unlawful conduct of Vail, Plaintiff, Lisa Cowles suffered injuries, damages, and losses as described elsewhere herein.

**WHEREFORE,** Plaintiff prays for judgment against Vail in an amount to be determined at trial and for such other and further relief as the Court deems just and proper

**COUNT IV**
**Exemplary Damages Based on**
**Willful and Wanton Conduct and**
**Circumstances of Fraud**
**v. Vail**

370.   Plaintiff incorporates all other allegations in this complaint as if set forth herein.

371.   At all relevant times, the provisions of C.R.S. § 13-21-102 were in effect.

372.   At all relevant times, C.R.S. § 13-21-102(1)(a) provided: "In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury is complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award [her] reasonable exemplary damages. The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party."

373.   At all relevant times, C.R.S. § 13-21-102(1)(b) provided: "As used in this section, 'willful and wanton conduct' means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."

374.   The Colorado Supreme Court has explained that this statutory definition of "willful and wanton conduct" includes "conduct that creates a substantial risk of harm to another and is purposefully performed with an awareness of the risk in disregard of the consequences." *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 215 (Colo. 1984).

375.   The Colorado Supreme Court has explained that this statutory definition of "willful and wanton conduct" includes conduct otherwise characterized as "gross negligence." *White v. Hansen*, 837 P.2d 1229, 1233 & n.5 (Colo. 1992).

376.   The Colorado Supreme Court has explained that this statutory definition of "willful and wanton conduct" includes conduct "exhibit[ing] a conscious disregard for the danger." *Martinez v. Estate of Bleck*, 2016 CO 58, ¶ 32.

377.   At all relevant times, Vail had actual notice and knowledge of the following facts and circumstances:

a. Zip-lining at high speeds can be associated with risk of serious injury or death;

b. The risks of serious injury and death associated with zip-lining were substantially greater on large-scale courses and canopy tours like the Game Creek zip-line course because such courses are designed and built to transport guests between taller towers, on higher and longer zip-lines, and at considerably higher speeds than other types of zip-lines;

c. Strict adherence to proper design, manufacture, assembly, installation, inspection, maintenance, and operation of zip-line courses and zip-line course fixtures and equipment, including braking systems, equipment, and components, was absolutely essential to preventing serious injuries and deaths to guests on large-scale zip-line courses and canopy tours like the Game Creek zip-line course;

d. Disregarding and failing to strictly adhere to proper design, manufacture, assembly, installation, inspection, maintenance, and operation of zip-line courses and zip-line course fixtures and equipment, including braking systems, equipment, and components, created a substantial and unreasonable risk of serious injury and deaths for guests on large-scale zip-line courses and canopy tours like the Game Creek zip-line course;

e. Zip-line course guests and users had been seriously injured or killed in dozens of zip-lining accidents on large-scale commercial zip-line courses and canopy tours like the Game Creek zip-line course;

f. Guests had been repeatedly injured in accidents on Vail's own zip-line courses including at least eleven (11) specific instances between August, 2013 and July, 2017, where guests were injured on its zip-line courses in Vail, Breckenridge, and

66

Park City, Utah;

g.   A guest was injured in an accident on the Game Creek zip-line course in late June, 2017;

h.   A braking system failed and malfunctioned on the Game Creek zip-line course in late June, 2017;

i.   The design and components of the braking system that failed in late June, 2017 were the same or substantially similar as the design and components of the braking system in use on the subject zip-line, including on July 7, 2017; and

j.   The braking systems, equipment, and components in use on the Game Creek course were subject to, or contained critical equipment and components that were subject to, sudden failure and malfunction while being used in a foreseeable manner.

378.   At all relevant times, Vail purposefully engaged in the following acts and omissions, with knowledge of the above facts and circumstances, so as to create a substantial and unreasonable risk of serious injury and death for users of the Game Creek course, including the Plaintiff, without regard to the consequences or to the rights and safety of others, including the Plaintiff:

a.   Vail continued to operate the Game Creek zip-line course after 11 incidents of injuries preceding the Plaintiff's accident, including an incident involving the failure of the brake system in late June, 2017, just before the Plaintiff's accident on July 7, 2017;

b.   After a guest was injured on the Game Creek zip-line course in late June, 2017, Vail did not timely and appropriately notify the manufacturer of the incident;

c.   After a braking system failed and malfunctioned on the Game Creek zip-line course in late June, 2017, Vail did not timely and appropriately notify the manufacturer of

the incident;

d. Vail did not timely and appropriately request that the manufacturer inspect the braking systems, equipment, and components in use on the course;

e. Vail did not timely and appropriately request that the manufacturer determine whether any modifications, retrofits, or repairs to braking systems, equipment, and components in use on the course would be needed in order for Vail to safely operate the course and guide guests down the zip-lines on the course;

f. Vail did not timely and appropriately consult with the manufacturer to determine whether it would be safe to continue operating the course before inspections, modifications, retrofits, or repairs could be performed, including with respect to the braking systems, equipment, and components in use on the course;

g. Vail did not cease operating the course until such time as inspections, modifications, retrofits, or repairs could be performed, including with respect to the braking systems, equipment, and components in use on the course;

h. Vail did not cease operating the course until it could determine whether it was safe to continue guiding guests down the zip-lines on the course utilizing the braking systems, equipment, and components installed on the course;

i. Vail failed to take appropriate or remedial action after it was on notice in June, 2017 that the braking system, equipment, and components on the Game Creek zip-line course had failed and malfunctioned and that such a failure or malfunction could cause serious injury or death to its guests;

j. Vail instead continued to operate and to charge guests for zip-line tours on the Game Creek zip-line course after the guest injury and braking system failure in

June, 2017, despite knowing that the braking systems on the course were experiencing problems and were subject to sudden failures and malfunctions that created a substantial and unreasonable risk of serious injury or death to guests on the course;

k.  Vail failed to disclose to guests, including the Plaintiff, that the braking system on the Game Creek zip-line course had failed and malfunctioned just days or weeks earlier despite knowing that most guests would consider such information material and germane to deciding whether to voluntarily use the course;

l.  Vail failed to disclose to guests, including the Plaintiff, that the braking system on the Game Creek zip-line course had failed and malfunctioned just days or weeks earlier and instead directed and instructed its supervisors, guides, and other personnel to repeatedly and falsely tell its guests that they should simply "trust the equipment" while on the course;

m.  Vail directed and instructed its supervisors, guides, and other personnel to disregard and deviate from normal operating procedures on July 7, 2017, despite knowing that doing so created a substantial risk of communications failures and errors by personnel on the course;

n.  Vail directed and instructed its supervisors, guides, and other personnel to disregard and deviate from normal operating procedures on July 7, 2017, despite knowing that doing so created a substantial risk of communications failures and errors by personnel on the course including errors in safely sending and receiving guests down the zip-lines on the Game Creek zip-line course;

o.  Vail directed and instructed its supervisors, guides, and other personnel to disregard

69

and deviate from normal operating procedures on July 7, 2017, despite knowing that doing so created a substantial risk of communications failures and errors by personnel on the course including errors in safely sending and receiving guests down the zip-lines on the Game Creek zip-line course;

p.   Vail directed and instructed its supervisors, guides, and other personnel to disregard and deviate from normal operating procedures on July 7, 2017, despite knowing that doing so created a substantial risk of communications failures and errors by personnel on the course including errors in timely and appropriately retrieving, redeploying, and resetting the braking systems and braking system equipment and components in use on the Game Creek zip-line course;

q.   Vail directed and instructed its supervisors, guides, and other personnel to disregard and deviate from normal operating procedures on July 7, 2017, despite knowing that doing so could lead to serious injuries; and

r.   Vail engaged in these acts and omissions in order to induce and rush guests through the remaining portion of their tour down the Game Creek zip-line course so that it would not have to pay refunds to such guests.

379.   The conduct of Vail as set forth in this Count and throughout this Complaint – including the continued operation of the Game Creek zip-line course after the guest injury and braking system failure of June, 2017; the continued operation of the course after its extensive knowledge that continued operations would likely put guests at risk of serious injury or death; and its other conduct in which it consciously disregarded guest safety, all as set forth herein and under the facts and circumstances set forth herein – was grossly negligent, reckless, willful, and wanton, and illustrated a conscious disregard for the rights and safety of others, including the Plaintiff.

380. As a direct and proximate result and consequence of the grossly negligent, reckless, willful, and wanton conduct of Vail and the fraudulent conduct of Vail, Plaintiff, Lisa Cowles suffered injuries, damages, and losses as described elsewhere herein.

**WHEREFORE,** Plaintiff prays for judgment against Vail including an award of exemplary damages in an amount to be determined at trial and for such other and further relief as the Court deems just and proper.

**COUNTS AGAINST ALL DEFENDANTS**

**COUNT V**
**Gross Negligence**

381. Plaintiff incorporates all other allegations in this complaint as if set forth herein.

382. In engaging in one or more of the acts and omissions set forth herein causing Plaintiff's injuries, Defendants acted willfully, wantonly, and recklessly, without regard for the consequences or the rights and safety of the Plaintiff.

383. As such, Defendants were grossly negligent and that gross negligence was a cause of Plaintiff's injuries.

384. Defendants' acts and omissions constituting gross negligence include but are not limited to the acts and omissions set forth elsewhere herein.

385. Defendant Bonsai Design's acts and omissions constituting gross negligence include but are not limited to the following:

    a. Designing, engineering, testing (or failing to test), manufacturing, preparing, installing, and selling custom braking systems on the Game Creek zip-line course that it knew would fail to prevent high-speed crashes under foreseeable conditions while marketing its custom braking systems as "eliminating" the possibility of such

crashes;

b.   Failing to take steps to address known defects with the zip-lines and zip-line braking systems, equipment, and components that it designed and installed on the Game Creek zip-line course, including but not limited to repeated entanglement of the redirection cord on reset of the braking systems, when it knew that failing to take such steps would subject guests to a substantial risk of serious injury or death, including but not limited due to sudden failure or malfunction of the braking systems, equipment, and components it designed, selected, and/or installed on the course;

c.   Failing to take steps to address additional known defects with the zip-line braking systems on the Game Creek zip-line course as modified with its knowledge and approval, including but not limited to an increased risk of the redirection cord failing, breaking, or being severed during use, of the primary braking system equipment appearing to have been fully and properly reset when in fact it was not, and of the secondary or emergency braking equipment failing to safely and independently slow or stop a guest in the event of a primary braking component failure, when it knew that failing to take such steps would subject guests to a substantial risk of serious injury or death, including but not limited due to sudden failure or malfunction of the braking systems, equipment, and components it designed, selected, and/or installed on the course;

d.   Failing to timely and appropriately advise Vail of the aforementioned defects with the zip-lines and braking systems, equipment, and components that it designed and installed on the Game Creek zip-line course, when it knew that failing to do so

72

would subject guests to a substantial risk of serious injury or death, including but not limited due to sudden failure or malfunction of the braking systems, equipment, and components it designed, selected, and/or installed on the course;

e.  Failing to timely and appropriately advise Vail that modifications made to the braking systems, equipment, and/or components prior to July 7, 2017 did not adequately address the risks of serious injury or death created by its zip-line and braking system designs, including but not limited to risks of braking system failure associated with tangling of the redirection cord, when it knew that failing to do so would subject guests to a substantial risk of serious injury or death, including but not limited due to sudden failure or malfunction of the braking systems, equipment, and components it designed, selected, and/or installed on the course;

f.  Failing to timely and appropriately advise Vail that modifications made to the braking systems, equipment, and/or components prior to July 7, 2017 increased the risk of the redirection cord failing, breaking, or being severed and the braking systems malfunctioning and failing during use, when it knew that failing to do so would subject guests to a substantial risk of serious injury or death, including but not limited due to sudden failure or malfunction of the braking systems, equipment, and components it designed, selected, and/or installed on the course;

g.  Failing to timely and appropriately advise Vail that modifications made to the braking systems, equipment, and/or components prior to July 7, 2017 created additional risks of braking system component failure including the primary braking equipment appearing to have been fully and properly reset when in fact it was not and the secondary or emergency braking equipment failing to safely and

independently slow or stop a guest in the event of a primary braking component failure, when it knew that failing to do so would subject guests to a substantial risk of serious injury or death, including but not limited due to sudden failure or malfunction of the braking systems, equipment, and components it designed, selected, and/or installed on the course;

h.  Withholding its knowledge of the above ramifications of modifications made to the braking systems, equipment, and/or components prior to July 7, 2017 with knowledge that doing so would subject guests to a substantial risk of serious injury or death, including but not limited due to sudden failure or malfunction of the braking systems, equipment, and components it designed, selected, and/or installed on the course;

i.  Failing to advise Vail that additional inspections, safety repairs, and modifications to the zip-lines and/or braking systems, equipment, and components were necessary in order to avoid subjecting guests to a substantial risk of serious injury or death, including but not limited due to sudden failure or malfunction of the braking systems, equipment, and components it designed, selected, and/or installed on the course, and including but not limited to as modified in or about April, 2017 and after a braking system failure where a guest was injured on June 24, 2017;

j.  Falsely certifying that the zip-lines and zip-line braking systems, equipment, and components on the Game Creek zip-line course were in an operable state and that any deficiencies identified or noted at the time of the inspection had been corrected when it knew that this was not true, when it was in fact aware of multiple defects with the zip-lines and zip-line braking systems, equipment, and components on the

74

course, and when it knew that so certifying would subject guests to a substantial risk of serious injury or death, including but not limited due to sudden failure or malfunction of the braking systems, equipment, and components it designed, selected, and/or installed on the course; and

k.  Such other and further acts and omissions constituting gross negligence as described elsewhere herein and as may yet be revealed in discovery.

386.  Defendants' gross negligence was a proximate cause of Plaintiff's accident and other injuries and damages.

**WHEREFORE,** Plaintiff prays for judgment against the Defendants in an amount to be determined at trial and for such other and further relief as the Court deems just and proper.

## CAUSATION & DAMAGES
### (All Defendants)

387.  Plaintiff incorporates all other allegations in this complaint as if set forth herein.

388.  As a direct and proximate result of the negligent and unlawful conduct of the Defendants as described herein, and the defective and unreasonably dangerous condition of the subject zip-lining course, fixtures, equipment, and components as described herein, Plaintiff, Lisa Cowles, has incurred, will in the future incur, and seeks recovery of the following general and special damages:

a.  Pain and suffering, mental anguish, and emotional distress, past and future;

b.  Reasonable and necessary medical, hospital, and rehabilitation care and services, nursing care and services, medication, therapy, and other expenses, past and future;

c.  Inconvenience;

d.  Loss of enjoyment of life and/or impairment of the quality of life;

e.   Loss of earnings and earning capacity;

f.   Physical impairment;

g.   Disfigurement and scarring; and

h.   Any other losses and damages sustained by Plaintiff and to which she is legally entitled either pursuant to statute or the common law.

389.   Plaintiff further seeks an award of exemplary damages against Vail in an amount to be determined by the trier of fact according to applicable law.

**WHEREFORE,** Plaintiff prays for and demands an award of damages to be fixed by the trier of fact in a reasonable amount. Additionally, Plaintiff asks for the costs of this action, reasonable attorney fees, all pre-judgment and post-judgment interest as provided by law, exemplary damages in an amount to be determined by the trier of fact, and for all such other relief to which she is or may be legally entitled and as the Court deems appropriate.

### PLAINTIFF DEMANDS A TRIAL BY JURY.

Dated this 15th day of June, 2020.

Respectfully submitted,

By:   s/ *Paul J. Komyatte*
        Paul J. Komyatte #22750
        David P. Mason #41333
        The Komyatte Law Firm LLC
        1536 Cole Blvd., Bldg. 4, Suite 300
        Lakewood, CO 80401
        Phone No. (720) 975-8553
        Fax No. (720) 528-8072
        Email   paul@komyattelawfirm.com
        Email   dave@komyattelawfirm.com

        **ATTORNEYS FOR PLAINTIFF**

76

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of June, 2020, a true and accurate copy of the foregoing was electronically filed with the Court and served upon all counsel of record via the Court's CM/ECF system:

**THE KOMYATTE LAW FIRM LLC**

*s/ David P. Mason*
David P. Mason, Esq.